UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| **KENNETH PUND,** *et al.* | : | Case No. 16-CV-1076 |
| | : | |
| Plaintiffs, | : | Judge Benita Y. Pearson |
| | : | |
| v. | : | |
| | : | MOTION FOR TEMPORARY |
| **CITY OF BEDFORD, OHIO,** *et al.* | : | RESTRAINING ORDER AND |
| | : | PRELIMINARY INJUNCTION AND |
| Defendants. | : | MEMORANDUM IN SUPPORT |

Plaintiffs Ken Pund and John Diezic hereby move, pursuant to Federal Rule of Civil Procedure 65(b), for issuance of a temporary restraining order and preliminary injunction enjoining enforcement of the City of Bedford's unconstitutional warrantless point of sale inspection requirements, which, on their face, subject those who withhold consent to the inspections to criminal liability and/or the inability to occupy their houses.

If Defendants' inspection mandates are not immediately enjoined, at least one Plaintiff will suffer irreparable harm for which there is no adequate remedy at law, including but not limited to criminal punishment solely as a result of refusing consent to an unlawful warrantless search. In support of this Motion, Plaintiffs respectfully submit the factual background and analysis below.

**I. INTRODUCTION**

Plaintiffs initiated this civil rights action on May 4, 2016 by filing a Verified Complaint challenging, facially and as applied to them, the City of Bedford's mandatory warrantless point of sale inspection policies, which apply to every home sold within the City.

In determining whether to grant the present motion for issuance of a temporary restraining order and preliminary injunction, the Court is to consider four factors: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would otherwise suffer irreparable injury; (3) whether the issuance of a temporary restraining order or preliminary injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of a temporary

1

restraining order or preliminary injunction. *McPherson v. Michigan High Sch. Athletic Ass'n*, 119 F.3d 453, 459 (6th Cir. 1997) (*en banc*). These factors are to be *balanced* against one another and should not be considered prerequisites to the granting of a temporary restraining order or preliminary injunction. *See United Food & Commercial Workers Union, Local 1099 v. Southwest Ohio Reg'l Transit Auth.,* 163 F.3d 341, 347 (6th Cir. 1998). This balance of interests weighs strongly in favor of the Plaintiffs and the granting of the present motion.

*First*, Plaintiffs are highly likely to succeed on the merits because the City of Bedford's point of sale inspection requirements unambiguously coerces Plaintiffs into consenting to warrantless general searches of their private houses, irrespective of whether probable cause exists to conduct such a search. As such, the search itself violates the Fourth Amendment to the United States Constitution. Meanwhile, punishing Plaintiffs for withholding their consent to such a search violates the Fifth and Fourteenth Amendment's "unconstitutional conditions doctrine," as interpreted and applied by the Supreme Courts of the United States and Ohio. *Secondly*, Plaintiffs face irreparable harm insofar as the City maintains the power to not only interfere with the sale of their homes, but to fine and criminally prosecute them for refusing their consent to this unconstitutional search. *Thirdly*, the requested injunctive relief would not result in any injury to Defendant or to third parties, as Plaintiffs merely request the right to engage in inherently harmless act of selling their perfectly safe and respectable homes to willing buyers – something that 99 percent of Ohioans to have sold a home have done without a government inspection.[1]

Moreover, enjoining the searches will benefit the public by maximizing protection of citizens' constitutional liberties - - it is always in the public interest to prevent the violation of constitutional rights.

## II. BACKGROUND[2]

### A. *Bedford's Prohibition on Selling Homes Absent a Warrantless Governmental Search*

---

[1] The vast majority of Ohio jurisdictions do not require point of sale inspections. According to one publication on the matter, only 22 Ohio cities require such inspections. See *http://www.systemtosell.com/point-of-sale-inspections-cleveland-ohio.htm*. It is unclear whether any of these jurisdictions require a warrant when consent is disallowed, or permit the inspections to be performed by private inspectors rather than government officials.

[2] All factual assertions are taken from Plaintiffs' May 4, 2016 Verified Complaint.

2

In Bedford, no person can sell his or her home without first enduring a warrantless government search of the entire property. This prohibition applies to forbid any person from selling his or her house, no matter what type of house or how high the quality or market demand. The City explains the realities of its warrantless search mandates on its website. First, it asserts that "Owners of residential or commercial real estate, including single-family and 2-family dwellings, duplexes, apartments, and condominiums and all commercial and industrial properties <u>are required to obtain a Certificate of Inspection</u> (Point of Sale) *prior to* entering into an agreement to sell or convey an interest in such property (including sales through Land Contracts)."[3] Any sale of property in Bedford is entirely forestalled until the warrantless search is completed by government, since "Sellers must provide the prospective buyer with a copy of the Certificate of Inspection or a copy of a Certificate of Occupancy prior to the execution or a contract of sale."[4]

These mandates are codified in Sections 1311.18-1311.22 of the City of Bedford Municipal Code. Section 1311.18 broadly prohibits the sale, or even an agreement to sell, any property within the city without a "Certificate of Inspection": "No person shall sell or enter into an agreement to sell or convey by land contract or otherwise, any interest in any dwelling, building or structure as defined in the Zoning Code without furnishing the buyer, prior to such sale, a current Certificate of Inspection." Section 1311.21(a) requires the property owner to proactively contact the City to seek a certificate of inspection, and further specifies that to acquire such a certificate, "[t]he building official may require the submission of an affidavit stating such information, and <u>he shall thereafter cause a general inspection to be made</u>."

Section 1311.21(b) chronicles the appalling breadth of the required searches, whereby every inch of the property is inspected by government: searches are conducted of basements, piping, stairways, plumbing fixtures, bathrooms, doors, windows, all electrical equipment, gutters and downspouts, masonry, siding, fences, kitchens, bathroom cabinet and countertops, and numerous other private spaces within and surrounding the home.

---

[3] See "Points of Sale Inspections – General Information," available online at City's website, *http://www.bedfordoh.gov/site.cfm/city-departments/building-department/point-of-sale-inspections.cfm*
[4] Id.

3

Much of the search is for features having nothing to do with health, safety, or the structural integrity of the property, and instead emphasizing the fastidious tastes of the inspector in the field. The code explicates this insubstantial purpose as follows: "[i]t is the intent of Bedford City Council to *preserve this architectural style and detail of its existing housing stock*. In the repair or alteration of a dwelling or accessory structure, particularly for the purposes of satisfying the Point of Sale requirements, *existing architectural details, materials and styles shall be preserved, repaired, matched or reproduced and not removed, altered, destroyed or replaced with alternate materials*." See Section 1311.21. To this end, "concrete walks and drives must be free of cracking," "repairs must match the existing surface *in color*," hedges must be "trimmed in such a way as to be structurally sound and *present an orderly appearance*," "exterior painted surfaces must be free of cracking, blistering, peeling, or other signs of deterioration, and "floor coverings" must be "free of stains." See 1311.21(b)(2).

Only after this broad inspection is completed and the condition of the home approved by the City inspector may a homeowner sell his or her house: "[w]hen it is determined by the Division of Building that a dwelling, building or structure is in compliance with the provisions of these Codified Ordinances and all other applicable rules and regulations applicable thereto, the Building Official shall issue a Certificate of Point of Sale Compliance for the premises." See Section 1311.21.

Failure to comply with the warrantless search is a serious crime for which one can be fined, prosecuted, and imprisoned: "Any person violating any provision Chapter 1311.18 of the Building and Housing Code will be guilty of a <u>misdemeanor of the first degree</u> and shall be punished as provided in Chapter 1311.28 of the Building and Housing Code of the City.[5]

Section 1311.28 supplies additional penalties that are imposed on those who refuse the City's warrantless searches: Whoever violates any of the provisions of this Chapter or any rule or regulation promulgated under authority of this Chapter, or fails to comply therewith or with any written notice or written order issued hereunder, shall be fined not less than fifty dollars ($50.00) nor more than five hundred

---

[5] Id.

4

dollars ($500.00) for the first offense, and, for a second or subsequent offense, shall be fined not less than one hundred dollars ($100.00) nor more than <u>one thousand dollars</u> ($1,000.00) or <u>imprisoned not more than six (6) months</u>, or both, and *each day such violation occurs or continues and each violation shall constitute a separate offense*.

Finally, homeowners are forced to *fund* the unlawful warrantless governmental inspections of their private homes: "The fee for the Point of Sale inspection varies from $50 for single-family dwelling plus $25 for each additional rental unit; commercial buildings are a minimum fee $75 and maximum fee $200."[6]

### B. *Bedford's enforcement and threatened enforcement against Plaintiffs*

Mr. Pund owns 27 properties, consisting of 44 separate addresses, within the city limits of Bedford; almost all of these are single family homes.[7] Mr. Pund will sell at least three of these properties this year, and the point of sale inspection requirement now poses an immediate threat to Mr. Pund's rights.

Mr. Pund has agreed to convey his property at 15 Mapledale Avenue to his daughter, Denise Lane, for approximately $50,000, at some point in May of 2016. Mr. Pund has agreed to convey his property at 234 Wandle Avenue to Mr. Manu Banner, the tenant who currently lives in that home, for approximately $100,000, at some point in July of 2016. Mr. Pund has agreed to convey his property at 546 Northfield Road to Mr. Jason Hawley, the tenant who currently lives in that home, for approximately $40,000, at some point in October of 2016. Mrs. Lane, Mr. Banner, and Mr. Hawley have each already provided Mr. Pund with some payment in anticipation of the property conveyances specified above.

Mr. Pund will not be consenting to point of sale searches on any of the above properties. Consequently, his ability to finalize sales of each home is at risk, as is his very liberty: in Bedford, it is a crime to withhold consent to such an inspection. Accordingly, Mr. Pund may be prosecuted at any time.

On March 17, 2016, Bedford Building Department representative Peggy Zelasko responded to an inquiry from Mr. Pund by indicating "[y]ou need rental inspections at the time of tenant change. You need a point of sale inspection prior to any title transfer."[8]

---

[6] Id. See also Section 1311.22.
[7] A listing of all of Mr. Pund's properties is available in his May 4, 2016 Verified Complaint.

5

### III. LAW AND ARGUMENT

Plaintiffs satisfy the elements necessary for issuance of a temporary restraining order and/or preliminary injunction enjoining the enforcement of the point of sale search requirements and their incidental provisions. Within the context of efforts to obtain preliminary injunctive relief to prevent violations of constitutional rights, the "'likelihood of success' factor is often determinative." *Connection Dist. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). And Plaintiffs are highly likely to succeed on the merits because (1) Plaintiffs maintain the right to refuse warrantless general searches of their houses; (2) Plaintiffs maintain the right to *exercise the aforesaid right* without enduring state-imposed criminal or financial penalties in response; (3) there is no exception to the warrant requirement permitting searches of this nature; and (4) Defendant City of Bedford maintains no other justification for searching these properties under this regulatory scheme without a warrant.

**A.    Plaintiffs are highly likely to succeed on the merits.**

  *i. The City of Bedford's warrantless search requirements violate the fundamental purposes of the Fourth Amendment.*

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Supreme Court of the United States has recognized that the Amendment reflects a number of foundational principles that require application in this case.

---

[8]    The day before, Mr. Pund had emailed the following to Ms. Zelasko, as part of an ongoing conversation regarding the point of sale and rental inspection requirements in Bedford: "Thank you for your response. I have new tenants moving into 144 Center Road up & down and 91 Solon Apt. 4 in mid-April. Do I need to have inspections on those? Also, what about that pre-sale inspection that I asked about? (I'm not putting that house up on the market, since the tenants are just buying it directly from me)."

6

*First and foremost*, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 748–749 (1984), citing *Payton v. New York*, 445 U.S., at 586.  And "a warrant is generally required for a search of a home."  *Brigham City v. Stuart,* 547 U.S. 398, 403 (2006).  Therefore, courts to have addressed the issue within the proper context have repeatedly concluded that searches of houses, even if "administrative" in nature, require a warrant - - "a search without a warrant demands exceptional circumstances."  *McDonald v. U.S.*, 335 U.S. 451, at 454-455 (1948).

*Second*, a fundamental purpose of the Amendment is "to protect against all general searches."  *Go–Bart Importing Co. v. United States,* 282 U.S. 344, 357 (1931).  And the dramatic scope of this search, without any warrant or requirement of individualized probable cause, renders it a *general* search (City officials may investigate every inch of *any* home just to assess whether a problem *may* exist).  In fact, in Section 1311.21(a), the City specifically describes the point of sale search as a "general inspection."

*Third*, "the suspicion-less search is one primary evil the Fourth Amendment was intended to stamp out."  See *Boyd v. United States,* 116 U.S. 616, at 625–630 (1886).  And of course, these searches are quintessentially "suspicion-less," *unless one is willing to consider every sale of a home inherently "suspicious."*  Homes are searched irrespective of their condition, irrespective of whether tenant or neighbor complaints have been lodged against the property or its owner, and even if a property owner were to voluntarily undergo and pass a private inspection from a non-governmental inspector.

For all of these reasons, "[w]hen a warrantless search has been conducted, the state bears the burden to establish that the search falls within one of the exceptions to the warrant requirement."  *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454–455; *State v. Kessler* (1978), 53 Ohio St.2d 204.  And, no plausible exception exists.

The Fourth Amendment was ratified to guard against precisely the type of searches Bedford is mandating here.  Accordingly, the only remaining question for the Court, on the merits, is whether subsequent precedent somehow exempts the searches from the Fourth Amendment's strictures.  Because it

7

does not (quite the opposite), Plaintiffs are likely to prevail on the merits, and the search and its supporting and enabling requirements must be enjoined.

### ii. *The Bedford warrantless point-of-sale inspections are "searches."*

*First*, the Fourth Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: when "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." *United States v. Jones,* 132 S.Ct. 945, 950–951 (2012). The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; and the phrase "in their persons, houses, papers, and effects" would have been superfluous. Indeed, the Fourth Amendment "indicates with some precision the places and things encompassed by its protections: 'persons, houses, papers, and effects.'" *Oliver v. United States,* 466 U.S. 170, 176 (1984). Simply put, a "search" occurs for Fourth Amendment purposes when the government physically intrudes upon one of these enumerated areas, or invades a protected privacy interest, for the purpose of obtaining information. *Syllabus to U.S. v. Jones*, 132 S.Ct. 945, at 949-950 (2012); *Katz v. United States,* 389 U.S. 347, 360–61 (1967)(Harlan, J., concurring).

Thus, "Fourth Amendment rights do not rise or fall with the *Katz* formulation" (the "reasonable expectation of privacy" test). To this end, the Supreme Court explains "[w]e [do not] believe that *Katz,* by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home." *Alderman v. United States*, 394 U.S. 165, 176 (1969). And The *Katz* reasonable-expectation-of-privacy test has been "added to, but not substituted for, the common-law trespassory test." *Jones*, supra. (Syllabus)(*Katz* added to the baseline the "expectations" test where no intrusion on property takes place, *Katz* "does not subtract anything from the Amendment's protections 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.'")

8

For this reason, courts analyzing the inspection of a dwelling or workplace do not entertain notions that the inspection could be something other than a "search," as contemplated by the Fourth Amendment. For instance, in *Mimics, Inc. v. Vill. of Angel Fire*, the Tenth Circuit Court of Appeals explained that inspections of property that "examine the interior of the premises" are searches:

> It is undisputed that on both occasions in question, Hasford sought entry to examine the interior of the premises . . . Even Hasford later stated that 'he intended to investigate whether Mr. Morrow should have obtained a building permit, whether he had violated other building code requirements, and whether a stop work order should be issued.' Moreover, evidence of Hasford's behavior indicates that he was conducting inspections of the property.

394 F.3d 836, 842-45 (10th Cir. 2005).

Here, the point of sale searches are "searches":  the City of Bedford insists on physically intruding within the most protected space that he Fourth Amendment protects - - private houses - - within the city for the purpose of obtaining information about garages, all fixtures, windows, doors, bathrooms, appliances, all lights, all locations containing electricity, and more.[9]  And this information is then used to impose criminal, civil liability, and economic harm upon the homeowner.[10]

   iii.  *Bedford coerces warrantless searches.*

The Supreme Court affirms that (1) "a search conducted over the objection of the owner of the premises sought to be searched is 'forcible,' whether or not violent means are used to effect the search;" and (2) "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority."  Quoting, respectively, *U.S. v. Biswell,* 406 U.S. 311, at 319 and *Bumper v. North Carolina*, 391 U.S. 543 (1968).[11]

---

[9] See Inspection Checklist, attached to Plaintiffs' Verified Complaint as Exhibit E.

[10] Meanwhile, it is axiomatic that anything within the city agent's plain view can serve as evidence in a non-property-related related criminal prosecution of the property owner and/or tenant.

[11] See also *State v. Taylor* 77 Ohio App.3d 223, at 226 (1991)("when the state attempts to justify a warrantless search on the basis of consent, the state must demonstrate that the consent was freely and voluntarily given and not the result of coercion, express or implied.")

Applying these principles to a search requirement identical to the one *here*, the Ohio Supreme Court explained, "A valid consent involves a waiver of constitutional rights and cannot be lightly inferred; hence, it must be 'voluntary and uncoerced, either physically or psychologically.'" *Wilson v. City of Cincinnati,* 46 Ohio St.2d 138, at 141 (1976), citing *United States v. Fike* (5th Cir., 1972), 449 F.2d 191, 193. Therefore, "where a municipal ordinance requires the owner of real property to tender a certificate of housing inspection to a prospective buyer, and such certificate may be obtained only by allowing a warrantless inspection of the property, the imposition of a criminal penalty upon the owner's *failure to tender the certificate* [separate and apart from his refusal to permit the inspection] violates the owner's rights under the Fourth Amendment to the United States Constitution." *Id*.

Here, the plain language of the ordinance confirms that Bedford's inspections, identical to those in *Wilson,* are coercive: refusal to consent to a warrantless search results in criminal, civil, and/or economic penalties. Further, Plaintiffs confirm that they have never consented to and will not consent to any further inspections.[12] Consequently, because Bedford's point of sale searches are warrantless and coercive, Plaintiffs are highly likely to prevail on the merits of their Fourth Amendment claim, and the search requirements must be enjoined.

   iv. *Warrantless searches of <u>houses</u> are generally unconstitutional.*

Bedford's mandatory home inspection program is impermissible because it mandates warrantless searches of the exact type of property explicitly and most stringently protected by the Fourth Amendment: "houses."

On this front, the Supreme Court is unmistakably clear: "a warrant is generally required for a search of a home." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Further, "[i]t is axiomatic that the 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313 (1972). "And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the

---

12   See Plaintiffs' Verified Complaint.

10

Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. It is not surprising, therefore, that the [Supreme] Court has recognized, as 'a basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 748–749 (1984), citing *Payton v. New York*, 445 U.S., at 586.

In *Steagald v. U.S.*, the Supreme Court further explained "[t]he search at issue here took place in the absence of consent or exigent circumstances. Except in such special situations, we have consistently held that the entry into a home to conduct a search or make an arrest is unreasonable under the Fourth Amendment unless done pursuant to a warrant." 451 U.S. 204, at 212 (1981), citing *supra,* and *Johnson v. United States*, 333 U.S. 10, 13–15 (1948). "Thus, . . . the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." Id., citing *Payton v. New York, supra*, 445 U.S., at 590; see also *Coolidge v. New Hampshire*, 403 U.S. 443, 474–475, (1971); *Jones v. United States*, 357 U.S. 493, 497–498 (1958); *Agnello v. United States*, 269 U.S. 20, 32–33 (1925). In *Donovan v. Dewey*, it was explained "Our prior cases hold that, absent consent or exigent circumstances, the government must obtain a warrant to conduct a search or effect an arrest in a private home."[13]

These principles, just like the Fourth Amendment's text, do not distinguish between houses that the owner desires to sell and those he or she wishes to continue to inhabit, lease, or rehabilitate. Consequently, "houses," as private dwellings, whether rental or owner-occupied, are entitled to the greatest level of constitutional protection, with respect to government searches.

v. **Warrantless "point of sale" searches of houses are generally unconstitutional.**

Point of sale inspections of homes are rarely challenged because sellers are unlikely to forestall the sale of their homes and prospective buyers lack the property interest to have standing to challenge the

---

[13] 452 U.S. 594 (1981)(Rehnquist, concurring), citing *Steagald*, supra.

inspections. However, courts to have considered the issue routinely conclude that such searches, in the absence of a warrant, violate homeowners' Fourth Amendment rights.

In *Wilson v. City of Cincinnati,* the Ohio Supreme Court confronted a local ordinance whereby "it can be seen that the homeowner, prior to entering into a contract for the sale of the property, is required to tender to the prospective buyer a Certificate of Housing Inspection. The failure to so comply, with three exceptions, renders the seller subject to the criminal penalty provided in subsection (F) and Ordinance No. 557-1973. A critical aspect of the legislation, however, is that the seller can obtain the certificate only by agreeing to a time when an inspector is permitted access to the property," and "[o]bviously, the seller is faced with a serious dilemma; either he must consent to a warrantless search or face the possibility of a criminal penalty." *Wilson v. City of Cincinnati*, 46 Ohio St. 2d 138, 138-49 (1976). In response, the Court concluded as follows:

> In the case before us, the coercion represented by the sole alternative of possible criminal prosecution clearly negates any 'consent' which may be inferred from the allowance of the inspection and, therefore, the validity of such searches upon the basis of consent is not sustainable. . . . *Therefore, where a municipal ordinance requires the owner of real property to tender a certificate of housing inspection to a prospective buyer, and such certificate may be obtained only by allowing a warrantless inspection of the property, the imposition of a criminal penalty upon the owner's failure to tender the certificate violates the owner's rights under the Fourth Amendment to the United States Constitution.*

*Wilson v. City of Cincinnati*, 46 Ohio St. 2d 138, 138-49 (1976). Consequently, the unconstitutionality of Bedford's presale inspection requirement is already clearly established in Ohio by binding precedent.

Federal courts to have considered the issue have followed suit. In *Makula v. Village of Schiller Park,* the District Court for the Northern District of Illinois explained why point of sale inspections fail Fourth Amendment scrutiny on their face:

> The Village argues that an owner's application for a license for a multiple family dwelling *constitutes consent* to inspection. However, in order to give a valid consent to a search, that consent must be voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041 (1973). . . .Under this Ordinance, however, owners and managers of multiple family dwellings do not have [the right to refuse to grant consent]. If they wish to operate their buildings, they must give consent to administrative searches, to be conducted at the whim of the municipality. If they do not consent, they may not operate their buildings, period. From the totality of these circumstances, it is clear that such a consent is not voluntary.

12

1995 WL 755305. As such, the Court had little trouble concluding that the warrantless presale inspection requirement violated the Fourth Amendment: "Simply put, the power of municipal building, fire, health, and other similar officials to enter any building without permission for the performance of duties is, in the absence of an emergency, violative of the constitutional guarantees against unreasonable search and seizure, unless a search has been authorized by a valid search warrant." *Id.,* citing Eugene McQuillin, The Law of Municipal Corporations § 24.557 p. 174 (3d ed. 1989).

Likewise, in *Hometown Co-Operative Apartments v. City of Hometown,* the Court considered an inspection scheme factually identical to Bedford's scheme.[14] The Court concluded that the inspection requirement violated the Fourth Amendment on its face, holding as follows: "under the principles of *Camara*, the ordinance is unconstitutional insofar as it fails to provide for a warrant procedure. . . [t]he Court finds further that the ordinance is unconstitutional under the fourth amendment insofar as it fails to provide for a warrant as a prerequisite for the point of sale inspection." 495 F.Supp., at 58 (1980).

Consequently, courts to have analyzed warrantless point of sale inspections consistently recognize that they violate clear Fourth Amendment requirements. As such, Plaintiffs are highly likely to prevail on the merits.

vi. **Warrantless <u>administrative searches of houses to enforce housing codes</u> are generally unconstitutional.**

The clear unconstitutionality of point of sale inspections is best understood through review of other cases analyzing administrative inspections of private residence to search for housing code violations. And

---

[14] 495 F.Supp. 58, at 56, 57 (1980). ("The ordinance makes it unlawful for the owner of residential property to sell or lease the property without providing the buyer or lessee of the Property Certificate of Housing Inspection issued by the city building department within the three-month period before the parties sign the contract for sale or lease. In order to obtain a Certificate of Housing Inspection, the owner of the property must apply for a Certificate, agree in writing to a time during the regular working hours of the building department when the residence can be inspected, and pay a fee. Pursuant to the ordinance the building department inspects the residence for compliance with the Hometown building, housing, property maintenance, and zoning codes.[4] Although the ordinance does not prohibit the sale or lease of the property, it does make it unlawful for a person who is the new owner or lessee of the residence to occupy the property until a certificate is issued. Failure to comply with the ordinance results in a fine for each offense. The City also may file suit and proceed to demolish, repair, enclose, recover costs, or sue for an injunction to force compliance with the inspection procedure.")

those cases clearly establish that, when warrantless, such inspections violate the Fourth Amendment on their face.

Seminal principles on the subject are established by the Supreme Court of the United States' 1967 decision in *Camara v. Municipal Court.* There, the Supreme Court held unconstitutional a San Francisco ordinance which permitted nonconsensual warrantless inspections of buildings and rental premises to ensure compliance with the city's housing code. *Camara v. Municipal Ct.*, 387 U.S. 523 (1967). As in the instant case, failure to consent to the warrantless, administrative searches authorized by the ordinance was punishable as a misdemeanor. *Camara*, 387 U.S. at 527 n.2. The case arose after an apartment building tenant refused an annual inspection. *Id.*

The *Camara* Court held that "such searches when authorized and conducted without a warrant procedure lack the traditional safeguards with the Fourth Amendment guarantees to the individual." *Id.* at 534. The Court found applicable to that situation the governing principle that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." 387 U.S. at pp. 528–529. Further, since "the governmental purpose behind the search would not be frustrated by the burden of obtaining a warrant, and because administrative searches of the type there at issue involved significant intrusions upon the interests protected by the Fourth Amendment," the Court determined that such searches could not be made without the owner's consent unless a search warrant had first been obtained. *Id.* The Court explained its rationale, which carries considerable force here:

> *[I]t is vigorously argued that the health and safety of entire urban populations is dependent upon enforcement of minimum fire, housing, and sanitation standards, and that the only effective means of enforcing such codes is by routine systematized inspection of all physical structures . . . The question is not, at this stage at least, whether these inspections may be made, but whether they may be made without a warrant*. . . . In summary, we hold that administrative searches of the kind at issue here are significant intrusions upon the interests protected by the Fourth Amendment, that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual. . .

***

> We simply cannot say that the protections provided by the warrant procedure are not needed in this context; broad statutory safeguards are no substitute for individualized review, particularly when those safeguards may only be invoked at the risk of a criminal penalty.

See *Camara, supra*, at 533, 539, 540. Here, Bedford's compulsion of a warrantless point of sale inspection to facilitate a governmental search for housing code violations is materially indistinguishable from the administrate searches *Camera* found to be impermissible.

Since *Camara,* Court's have authoritatively and persuasively struck down warrantless search requirements tantamount to Bedford's point of sale inspection scheme. In *Baker v. Portsmouth,* decided by the Southern District of Ohio in October of 2015, Judge Dlott considered an inspection ordinance whereby "Inspections [of rental property] are conducted at least once a year and on a minimum of forty-eight hours' notice, unless the time period is waived by the tenant or occupant. . . The scope of the search is limited by the items on the dwelling inspection checklist, a list of eighty search items divided into the following categories: exterior premises, common egress corridor, interior, kitchen/dining, hallways, laundry, basement/mechanicals, bedrooms, bathrooms, and other." *Baker v. City of Portsmouth*, No. 14-CV-512, 2015 WL 5822659 (S.D. Ohio Oct. 1, 2015).

There, as here, "Plaintiffs claim that the Code violates their Fourth Amendment rights by mandating warrantless inspections of their properties without probable cause." *Baker,* at p. 3. In response to this argument, the Court acknowledged the requisite analysis, explaining "[t]herefore, unless a recognized exception to the warrant requirement applies, the Code's failure to include a warrant provision violates the Fourth Amendment." *Baker,* at p. 5. The Southern District of Ohio ultimately agreed with the proposition that "the Code is unconstitutional as applied and on its face, because it mandates warrantless, coerced inspections of the interior of private homes without probable cause." *Id.*

In doing so, the Court took account of governing precedent, including that recently established by the Supreme Court in 2015: "[t]he Supreme Court has repeatedly held that 'searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable subject

15

only to a few specifically established and well-delineated exceptions." *City of Los Angeles v. Patel*, 135 S.Ct. 2443, 2452 (2015). The Court then properly concluded as follows:

> "Guided by the above cases, the Court finds that the Portsmouth RDC violates the Fourth Amendment insofar as it authorizes warrantless administrative inspections. It is undisputed that the RDC affords no warrant procedure or other mechanism for precompliance review. As in the above cases, the owners and/or tenants of rental properties in Portsmouth are thus faced with the choice of consenting to the warrantless inspection or facing criminal charges, a result the Supreme Court has expressly disavowed under the Fourth Amendment. *See Camara*, 387 U.S. at 532. *See also Patel*, 135 S.Ct. at 2452 . . . . Therefore, unless a recognized exception to the warrant requirement applies, the Code's failure to include a warrant provision violates the Fourth Amendment."
>
> ***
>
> When balanced against the significant privacy interest and substantial intrusion thereon, the Court concludes that the warrantless inspections authorized by the Code are unreasonable under the Fourth Amendment. Having determined that the Code is not saved by special needs or the closely regulated industry exceptions, the Court concludes that the Code's failure to include a warrant provision violates the Fourth Amendment.

*Baker v. City of Portsmouth*, No. 1: 14CV5L2, 2015 WL 5822659, at 3-7 (S.D. Ohio Oct. 1, 2015).

Likewise, in the non-binding though highly persuasive case of *Sokolov v. Village of Freeport,* the Court of Appeals of New York (the State's Supreme Court) unanimously held that imposition of a penalty upon a landlord for leasing his or her premises without first consenting to a warrantless search violates the property owner's Fourth Amendment rights. *Sokolov v. Village of Freeport*, 52 N.Y.2d 341, 420 N.E.2d 55 (1981). Finally, in *Dearmore v. City of Garland,* the Fifth Circuit Court of Appeals affirmed a District Court's application of *Camara* to invalidate warrantless housing code inspections akin to those sought by Bedford here. *Dearmore v. City of Garland,* 519 F.3d 517 (2008); *Dearmore v. City of Garland,* 400 Supp.2d 894, 903 (N.D. Tex., 2005), citing *United States v. Santiago,* 410 F.3d 193, 198–99 (5th Cir.2005); *United States v. Olivier–Becerril,* 861 F.2d 424, 425 (5th Cir.1988).

*Camara, Baker, Sokolov,* and *Dearmore,* alongside the house search cases cited above, persuasively demonstrate that forced warrantless searches of houses (whether owner-occupied, tenant occupied, or unoccupied) for housing code violations violate the Fourth Amendment. Thus, binding and persuasive precedent striking down search requirements materially identical to Bedford's point of sale searchs demonstrates that Plaintiffs are likely to prevail on the merits of their Fourth, Fifth, and Fourteenth

16

Amendment claim. Accordingly, this Court should enjoin Bedford's search requirement and ancillary impositions.

> vii. *No exception to the warrant requirement applies here.*

"When a warrantless search has been conducted, the state bears the burden to establish that the search falls within one of the exceptions to the warrant requirement." *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454–455; *State v. Kessler* (1978), 53 Ohio St.2d 204. Having ruled out consent, courts have identified only two exceptions to the warrant requirement that could even potentially apply here. However, neither is even remotely applicable, and each has explicitly and properly been rejected.

First, houses that are for sale are not "the stock of a closely regulated business" because the sale of homes is not a "closely regulated business." This understanding was reaffirmed by the Supreme Court's recent decision in *Patel v. City of Los Angeles* (refusing to characterize hotels as such businesses, and noting the extremely finite nature of the exception - - it only applies to four highly regulated and hazardous businesses) and the Southern District of Ohio's subsequent decision in *Baker v. Portsmouth* (properly rejecting the premise that residential rental of property was the stock of a closely regulated business).

Second, the "special needs" requirement could not plausibly apply: that exception permits warrantless searches only where the state maintains an extreme level of oversight and control over those searched - - school children at school, those in prison, and those on probation or parole. Accordingly, the *Baker* court also rejected this argument as to residential homes. And rightfully so: one's rights are neither reduced to the level of a child or prisoner simply because he or she is selling a home.

> viii. *Bedford's warrantless point of sale search mandates are unconstitutional on their face.*

The point of sale search requirements must be entirely enjoined, rather than just as against the named Plaintiffs here. The *Patel* Court concluded "we hold that § 41.49(3)(a) is facially unconstitutional because it fails to provide hotel operators with an opportunity for precompliance review." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2448 (2015).

Likewise, in *Baker,* the plaintiffs argued that "the Code is unconstitutional as applied and on its face, because it mandates warrantless, coerced inspections of the interior of private homes without probable cause." *Baker,* supra, at. 3. Judge Dlott observed "[g]uided by the [] cases, the Court finds that the Portsmouth RDC violates the Fourth Amendment insofar as it authorizes warrantless administrative inspections. It is undisputed that the RDC affords no warrant procedure or other mechanism for precompliance review. As in the above cases, the owners and/or tenants of rental properties in Portsmouth are thus faced with the choice of consenting to the warrantless inspection or facing criminal charges, a result the Supreme Court has expressly disavowed under the Fourth Amendment." *Baker,* at. P. 5. This result comports with the rulings on point of sale inspection mandates cited above.

Thus, Plaintiffs are highly likely to prevail on the merits of their claim that the inspection mandate is *facially* unconstitutional; and the ordinance must therefore be enjoined in its entirety.

**B. Plaintiffs are confronted with irreparable injury.**

A plaintiff's harm from the denial of a preliminary injunction is irreparable if it is not fully compensable by monetary damages. *Basicomputer Corp. v. Scott,* 973 F.2d 507, 511 (6th Cir.1992). Courts have also held that a plaintiff can demonstrate that a denial of an injunction will cause irreparable harm if the claim is based upon a violation of the plaintiff's constitutional rights. *See, e.g., Connection Distrib. Co. v. Reno,* 154 F.3d 281, 288 (6th Cir.1998) (recognizing that the loss of First Amendment rights, for even a minimal period of time, constitutes irreparable harm).

Further, the protection of Fourth Amendment rights warrants equitable relief: "given the fundamental right involved, namely, the right to be free from unreasonable searches— [one] may suffer irreparable harm arising from a possible deprivation of his constitutional rights." *See Mitchell v. Cuomo,* 748 F.2d 804, 806 (2d Cir.1984). For this reason, District Courts within the Sixth Circuit, particularly since *Patel v. City of Los Angeles,* do not hesitate to enjoin impending searches and seizures on grounds of irreparability. See *Hardrick v. City of Detroit*, No. 15-13884, 2016 WL 692528, at *1-6 (E.D. Mich. Feb. 22, 2016).

Meanwhile, satisfaction of the first prong of the preliminary injunction standard – demonstrating a strong likelihood of success on the merits – also satisfies the irreparable injury standard. *See Elrod v. Burns*, 427 U.S. 347, 373 (1973) (holding that if a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated); *Connection Distributing Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Herein, Plaintiffs have undeniably demonstrated a substantial likelihood of success on the merits. Thus, Plaintiffs will suffer irreparable injury if Defendant is not immediately enjoined from enforcing its unconstitutional policy.

Further, Plaintiffs here face imminent criminal prosecution and sanction in response to the exercise of their fundamental constitutional rights. They also face severe economic penalty: if they do not permit the search, their house becomes uninhabitable and essentially worthless to any would-be buyer.

**C. No public interest is served by continued enforcement of the point of sale inspection requirements, nor would private harm accrue.**

Neither the City nor any private residents will suffer any harm should an injunction be issued. The vast majority of Ohioans, whether residing in wealthier, less affluent, older, or newer cities than Bedford, have sold their homes without forced governmental point of sale inspections. Even formal historical districts such as German Village in Columbus do not require point of sale searches. Consequently there is little basis to believe that bedlam will ensue once Bedford is required to comply with the Fourth Amendment.

Likewise, the Plaintiffs' Verified Complaint demonstrate that their properties pose no threat to any individual - - no complaint has ever been made against the Plaintiffs or their properties, and they have affirmed that they harbor no dangerous conditions at their properties.

Finally, enjoining the warrantless search requirements would not prevent Bedford from inspecting homes *when it actually maintains probable cause to believe that there is a problem within the home,* such as when a tenant or neighbor reports a problem, or when problems are visually observable from the road or sidewalk. In fact, freeing up more public resources to focus on *problematic* housing may *better* advance the interest of the public and third parties. Indeed, the City is hard-pressed to claim that they would be

harmed by an injunction since they have "no right to the unconstitutional application of state laws." *Tyson Foods, Inc. v. McReynolds*, 865 F.2d 99, 103 (6th Cir. 1989).

IV. **CONCLUSION**

For the foregoing reasons, this Court must enjoin the City of Bedford's mandatory warrantless point of sale searches all enforcement and the aforesaid ancillary policies at once.

Respectfully submitted,

*/s/ Maurice A. Thompson*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
208 E. State Street
Columbus, Ohio 43215
Tel: (614) 340-9817
Fax: (614) 365-9564
*MThompson@OhioConstitution.org*

Sheldon Berns (0000140)
Berns, Ockner & Greenberger, LLC
3733 Park East Drive, Suite 200
Beachwood, Ohio 44122
Tel: (216) 831-8838, Ext. 205
Fax: (216) 464-4489
*SBerns@BernsOckner.com*

Christopher Finney (0038998)
Finney Law Firm, LLC
4270 Ivy Pointe Boulevard, Suite 225
Cincinnati, Ohio 45245
(513) 943-6660 phone
(513) 943-6669 fax
*Chris @Finneylawfirm.com*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing motion and memorandum in support, as well as the verified complaint filed in this action, will be served upon the City Solicitor for the City of Bedford this 5th Day of May, 2016.

*/s/ Maurice A. Thompson*

20