| | | |
|---|---|---|
| **KENNETH PUND,** *et al.* | **:** | **Case No. 16-CV-1076** |
| | **:** | |
| **Plaintiffs,** | **:** | **Judge Benita Y. Pearson** |
| | **:** | |
| **v.** | **:** | |
| | **:** | **MOTION FOR PARTIAL SUMMARY** |
| **CITY OF BEDFORD, OHIO,** *et al.* | **:** | **JUDGMENT** |
| | **:** | |
| **Defendants.** | **:** | |

## I.        INTRODUCTION

The City of Bedford, in applying the original pre-sale and rental inspection requirements against Plaintiffs and the class members by coercively searching their houses without a warrant, violated the Fourth, Fifth, and Fourteenth Amendment rights of those Plaintiffs and class members.  And because the searches were unlawful, fees imposed to fund them must be returned to those who paid them.  Consequently, and for the reasons below, Plaintiffs are now entitled to judgment as a matter of law on the first, second, fourth, ninth, and thirteenth requests for relief in their First Amended Complaint:

1.        Declare that the City of Bedford's Point of Sale Inspection Requirements and Rental Inspection Requirements, as they existed on May 4, 2016, authorizing warrantless searches without probable cause, are unconstitutional, both facially and as applied to Plaintiffs

2.        Declare that provisions of the original Point of Sale Inspection Requirements and current Rental Inspection Requirements wholly reliant upon the unconstitutional search, including but not limited to the monetary extraction for inspections and the permit requirement, violated Plaintiffs' Fourth Amendment rights

4.  Declare that through the imposition of monetary assessments on Plaintiffs and others, precipitated by the City's desire to fund the costs of the Point of Sale Inspection Requirements and Rental Inspection Requirements, Defendant City of Bedford has been and continues to be unjustly enriched;

9.  Mandate the return of Point of Sale Inspection and Rental Inspection fees paid by Plaintiffs and others to Defendant City of Bedford;

13.  Reimburse Plaintiffs for amounts they have paid to the City of Bedford in inspection fees related to unconstitutional inspections.

See Doc. 21, PageID 200, 201.[1]

## II. BACKGROUND

Plaintiffs originally filed this lawsuit seeking facial invalidation of the City of Bedford's Point of Sale Inspection Requirements (warrantless inspections and mandatory fees funding the inspections) on May 4, 2016. Shortly thereafter, this Court entered an order preliminarily enjoining the Point of Sale Inspection Requirements. In response to Plaintiffs' Motion for Permanent Injunction, filed May 12, 2016, the City indicated on August 5 that it had amended its Point of Sale inspection regulations. Doc 17-1.

On September 8, 2016 Plaintiffs proffered their First Amended Complaint, adding (1) parallel claims challenging The City's parallel mandatory *rental* inspection program; and (2) class allegations pertaining to both the Point of Sale and Rental Inspection mandates. See Docs 18, 21.

This Court granted Plaintiffs' Motion for Class Certification on July 28, 2017, certifying the following two classes:

**Subclass A**: All individuals and businesses that have (1) been subjected to Point of Sale Inspections between September 10, 2014 and January 30, 2017; and (2) paid Point of Sale Inspection fees to the City of Bedford in conjunction with the aforesaid inspection(s).

**Subclass B**: All individuals and businesses that have (1) been subjected to Rental Inspections between September 10, 2014 and February 14, 2017; and (2) paid Rental Inspection fees to the City of Bedford in conjunction with the aforesaid inspection(s).

Doc. 35, PageID 367. In certifying the foregoing classes, this Court succinctly summarized the issues now before it: even though the City of Bedford has altered its policies in response to this lawsuit, "the Class representatives seek declaratory relief and the return of Point of Sale and Rental Inspection fees illegally paid to Defendant," and "Plaintiffs' claims for declaratory relief – a prerequisite to an order that restitution be paid – are not moot." Doc. 35, PageID 363 and 366, respectively.

## III. STANDARD FOR SUMMARY JUDGMENT AND SUMMARY JUDGMENT EVIDENCE

Under Federal Rule of Civil Procedure 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."

---

[1] Plaintiffs' Motion is "Partial" insofar as their 11th Request for Relief - - for reasonable expenses and attorneys fees pursuant to Section 1988 - - is not properly before the Court at this time.

Fed. R. Civ. P. 56(a). "The moving party has the initial burden of proving that no genuine issue of material fact exists, and the court must draw all reasonable inferences in the light most favorable to the nonmoving party." *Stansberry v. Air Wisconsin Airlines Corp*., 651 F.3d 482, 486 (6th Cir. 2011); *cf.* Fed. R. Civ. P. 56(e)(2) (providing that if a party "fails to properly address another party's assertion of fact" then the Court may "consider the fact undisputed for purposes of the motion").

"Once the moving party meets its initial burden, the nonmovant must 'designate specific facts showing that there is a genuine issue for trial.'" *Kimble v. Wasylyshyn*, 439 Fed. Appx. 492, 2011 WL 4469612, at 3 (6th Cir. 2011); *see also* Fed. R. Civ. P. 56(c) (requiring a party maintaining that a fact is genuinely disputed to "cit[e] to particular parts of materials in the record"). "The nonmovant must, however, do more than simply show that there is some metaphysical doubt as to the material facts, . . . there must be evidence upon which a reasonable jury could return a verdict in favor of the non-moving party to create a genuine dispute." *Lee v. Metro. Gov't of Nashville & Davidson Cnty*., 432 F. Appx. 435, 441 (6th Cir. 2011). "When a motion for summary judgment is properly made and supported and the nonmoving party fails to respond with a showing sufficient to establish an essential element of its case, summary judgment is appropriate." *Stansberry*, 651 F.3d at 486.

The following summary judgment evidence is now properly before the Court:

(1) Plaintiffs' Complaint is verified by Plaintiffs' Declaration. Further, the City has not contested the material factual allegations in either the Complaint or Amended Complaint. See Doc. 11, PageID 77-78 (acknowledging "the parties' affirmation that there are at this time no genuine disputes as to any of the material facts pled in Plaintiffs' May 4, 2016 Verified Complaint"). Accordingly, Plaintiffs' Complaints and the exhibits attached thereto constitute summary judgment evidence. See Doc. 1, PageID 1-20, Doc 1-1 (Verification of Plaintiff Ken Pund).

(2) Point of Sale Inspection information publicized by the City of Bedford and City Point of Sale Ordinances, attached to Plaintiffs' Complaint as "Exhibits A and B," Doc. 1-2 and Doc. 1-3.

(3) Correspondence from the City of Bedford to Plaintiff Ken Pund threatening enforcement of Point of Sale mandates against him and sanctions in the event of non-compliance, attached to Plaintiffs' Complaint as "Exhibit C," Doc. 1-4.

(4) City of Bedford Inspection Checklist, attached to Plaintiffs' Complaint as "Exhibit D," Doc. 1-5.

(5) City of Bedford Rental Inspection Ordinances, attached to Plaintiffs' First Amended Complaint as "Exhibit F". Doc. 21, PageID 202.

(6) City of Bedford description of the "Rental Program," attached to Plaintiffs' First Amended Complaint as "Exhibit G." Doc. 21, PageID 204.

(7) City of Bedford summary of the number of rental and point of sale inspections by year and revenue received from such inspections by year, attached to Plaintiffs' First Amended Complaint as "Exhibit H." Doc. 21, PageID 205.

(8) Documents evidencing City of Bedford enforcement of point of sale inspection mandates against Plaintiff Stephanie Jowers, attached to Plaintiffs' First Amended Complaint as "Exhibit I." Doc. 21, PageID 206-207.

(9) February 9, 2017 Affidavit of Plaintiff Ken Pund. Doc. 22-1.

(10)    City of Bedford Rental Inspection "Checklist". Doc. 22-2.

(11)    Affidavit of City of Bedford Homeowner Brenda Flask confirming continued coercive enforcement of City Rental Inspection mandates up through February 13, 2017 and evidence of such enforcement. Doc. 26-1.

(12)    Defendants' Discovery Responses, attached hereto.

(13)    The Affidavit of Brandy Fitch, summarizing data on identity, number of, and fees paid by class members, attached hereto.

This evidence simply serves to confirm that Plaintiffs are entitled to judgment as a matter of law.

IV.    **MATERIAL FACTS**

Under the City of Bedford's longstanding policies, amended only subsequent to Plaintiffs' initiation of this litigation, no person could sell or rent his or her home without first enduring a warrantless government search of the entire interior and exterior of the property. These prohibitions applied irrespective of the type, condition, or location of the house. Meanwhile, the City forced the unlawfully-searched homeowners to *pay for* these coerced inspections.

A.    **Bedford's Prohibition on Selling Homes Absent a Warrantless Governmental Search**

The City explained the realities of its warrantless Point of Sale search mandates on its website, asserting that "Owners of residential or commercial real estate, including single-family and 2-family dwellings, duplexes, apartments, and condominiums and all commercial and industrial properties are required to obtain a Certificate of Inspection (Point of Sale) *prior to* entering into an agreement to sell or convey an interest in such property (including sales through Land Contracts)."[2] Doc. 1-2. Any sale of property in Bedford was entirely forestalled until the

_____

[2]    See "Points of Sale Inspections – General Information," available online at City's website, *http://www.bedfordoh.gov/site.cfm/city-departments/building-department/point-of-sale-inspections.cfm*

warrantless search was completed by government, since "Sellers must provide the prospective buyer with a copy of the Certificate of Inspection or a copy of a Certificate of Occupancy prior to the execution or a contract of sale."[3]

These mandates were codified in Sections 1311.18-1311.22 of the City of Bedford Municipal Code. Doc. 1-3. Section 1311.18 broadly prohibited the sale, or even an agreement to sell, any property within the city without a "Certificate of Inspection": "No person shall sell or enter into an agreement to sell or convey by land contract or otherwise, any interest in any dwelling, building or structure as defined in the Zoning Code without furnishing the buyer, prior to such sale, a current Certificate of Inspection." Section 1311.21(a) required the property owner to proactively contact the City to seek a certificate of inspection, and further specified that to acquire such a certificate, "[t]he building official may require the submission of an affidavit stating such information, and <u>he shall thereafter cause a general inspection to be made</u>."

Section 1311.21(b) chronicled the appalling breadth of the required searches, whereby every inch of the home was inspected by government: searches were conducted of basements, piping, stairways, plumbing fixtures, bathrooms, doors, windows, all electrical equipment, gutters and downspouts, masonry, siding, fences, kitchens, bathroom cabinet and countertops, and numerous other private spaces within and surrounding the home. See also Doc. 1-5.

Much of the search was for issues having nothing to do with health, safety, or the structural integrity of the property, and instead emphasizing the fastidious tastes of the inspector in the field. The code explicated this insubstantial purpose as follows: "[i]t is the intent of Bedford City Council to *preserve this architectural style and detail of its existing housing stock*. In the repair or alteration of a dwelling or accessory structure, particularly for the purposes of satisfying the Point of Sale requirements, *existing architectural details, materials and styles shall be preserved, repaired, matched or reproduced and not removed, altered, destroyed or replaced with alternate materials*." See Section 1311.21. To this end, "concrete walks and drives must be free of cracking," "repairs must match the existing surface *in color*," hedges must be "trimmed in such a way as to be structurally sound and *present an orderly appearance*," "exterior painted surfaces must be free of cracking, blistering, peeling, or other signs of deterioration, and "floor coverings" must be "free of stains." See 1311.21(b)(2).

---

[3]     Id.

Only after this broad inspection was completed and the condition of the home approved by the City inspector could a homeowner sell his or her house: "[w]hen it is determined by the Division of Building that a dwelling, building or structure is in compliance with the provisions of these Codified Ordinances and all other applicable rules and regulations applicable thereto, the Building Official shall issue a Certificate of Point of Sale Compliance for the premises." See Section 1311.21.

Failure to comply with the warrantless search was a serious crime for which one could be fined, prosecuted, and imprisoned: "Any person violating any provision Chapter 1311.18 of the Building and Housing Code will be guilty of a misdemeanor of the first degree and shall be punished as provided in Chapter 1311.28 of the Building and Housing Code of the City.[4]

Section 1311.28 supplied additional penalties that those who refused the City's warrantless searches could face: "Whoever violates any of the provisions of this Chapter or any rule or regulation promulgated under authority of this Chapter, or fails to comply therewith or with any written notice or written order issued hereunder, shall be fined not less than fifty dollars ($50.00) nor more than five hundred dollars ($500.00) for the first offense, and, for a second or subsequent offense, shall be fined not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00) or imprisoned not more than six (6) months, or both, and *each day such violation occurs or continues and each violation shall constitute a separate offense*." And the City reserved the power to impose cumulative penalties beyond those aforementioned: "Whoever causes or permits the continuation of any violation of this Chapter or any rule or regulation promulgated hereunder or fails to comply therewith or with any written notice or written order issued hereunder, subsequent to conviction therefore, shall be liable for further prosecution, conviction and punishment upon the same order or notice without the necessity of issuing a new order or notice, until full compliance has been had on such order or notice upon which the original conviction was had." See 1311.28(a). And on top of all of this, the City could forcibly remove the homeowner or tenant from any home that has not been searched, rendering the home vacant and valueless until the search is complied with: "The imposition of any penalty shall not preclude the Director of Law from instituting an appropriate action or proceeding in a court of proper

---

[4] Id.

jurisdiction to prevent an unlawful repair or maintenance, or to restrain, correct or abate a violation, or to <u>prevent the occupancy of a building, structure or premises</u> . . ." See 1311.28(b).

**B.      Bedford's Prohibition on Leasing Homes Absent a Warrantless Government Search**

The City of Bedford also forcibly conducted warrantless searches of private rental dwellings through its Residential Building Code (hereinafter "the Code"). Section 1311.05 of the Code granted building officials a right to enter any building or premises to conduct their duties. Included in these duties was the execution of "general inspections," defined in section 1311.21(b) as encompassing everything from electrical equipment to bathroom floors and kitchen cabinets. Section 1311.06(d) of the Code classified refusal to consent to general inspections as a minor misdemeanor, punishable by fines up to $1,000 and imprisonment up to six months.

Not only did the criminal sanctions of Section 1311.06 eliminate any resistance to general inspections, but Section 1311.30(b) makes them a mandatory part of owning a rental property. This provision required a general inspection whenever property owners applied for a rental license, and Section 1311.29 prohibited renting any dwelling other than a boarding house without a rental license. Per Section 1311.32(b), owners of rental properties were required to "apply" for new licenses every two years or whenever changing tenants. And the penalties described above in Section 1311.28 also apply to non-compliance with rental inspections.

As described on the City's website, the effect of these provisions was to require an inspection of both the "interior and exterior" of rental units as well as "nature" of tenants, occurring at least every two years and whenever there is a change in tenancy. Doc. 21, PageID 201. Therefore, Plaintiffs and members of Class B were subjected to biennial violations of their rights as a condition of renting homes to others in the City of Bedford.

**C.      Bedford's enforcement and threatened enforcement**

On March 17, 2016, Bedford Building Department representative Peggy Zelasko responded to an inquiry from Plaintiff Ken Pund by indicating "[y]ou need rental inspections at the time of tenant change. You need a point of sale inspection prior to any title transfer."[5] Doc. 1-4.

---

[5]      The day before, Mr. Pund had emailed the following to Ms. Zelasko, as part of an ongoing conversation regarding the point of sale and rental inspection requirements in Bedford: "Thank you for your response. I have new tenants moving into 144 Center Road up & down and 91 Solon Apt. 4 in mid-April. Do I need to have inspections on those? Also, what about that pre-sale inspection that I asked about? (I'm not putting that house up on the market, since the tenants are just buying it directly from me)."

D. **Bedford's Prohibition on selling or leasing homes without paying for the violation of their rights**

Homeowners were forced to *fund* the unlawful warrantless governmental inspections of their private homes: "The fee for the *Point of Sale* inspection varies from $50 for single-family dwelling plus $25 for each additional rental unit; commercial buildings are a minimum fee $75 and maximum fee $200." Doc. 1-2, PageID 22. As to rental inspections, "a yearly fee of $50 per SINGLE-family, $75 for TWO-family, $100 for THREE family dwelling unit. . . or the amount of $20 per suite in a structure with FOUR or more apartments" was due at the time of the required applications. Doc. 21, PageID 204.

E. **The Classes consist of 570 total members who are owed $61,700 in restitution.**

The October 12, 2017 Affidavit of Paralegal Brandy Fitch affirms that, after reviewing all evidence in light of the Court's rulings, Ms. Fitch confirmed the existence of 376 distinct members of Subclass A (Point of Sale inspections) and 194 distinct members of Subclass B (Rental inspections). Utilizing proper methodology, Ms. Fitch was further able to confirm that a total of $23,575 in unlawful inspection fees were paid by the members of Subclass A, while $38,125 in unlawful inspections fees were paid by the members of Subclass B.

III. **LAW AND ARGUMENT**

"When a warrantless search has been conducted, the state bears the burden to establish that the search falls within one of the exceptions to the warrant requirement." *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454–455; *State v. Kessler* (1978), 53 Ohio St.2d 204. Law and evidence confirm that no such exception applies here.

As such, Plaintiffs are entitled to summary judgment because (1) Plaintiffs maintain the right to refuse warrantless suspicion-less general searches of their houses; (2) Plaintiffs maintain the right to *exercise the aforesaid right* without enduring state-imposed criminal or financial penalties in response; (3) there is no exception to the warrant requirement permitting searches of this nature; (4) Defendant City of Bedford maintains no other justification for searching these properties under this regulatory scheme without a warrant; and (5) those who have been warrantlessly searched and charged for such searches are entitled to restitution.

A. **The City of Bedford's original longstanding Point of Sale and Rental Search Mandates violated Plaintiffs' Fourth Amendment Rights.**

The Fourth Amendment to the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." The Supreme Court of the United States has recognized that the Amendment reflects a number of foundational principles that require application in this case.

*First and foremost*, "searches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 748–749 (1984), citing *Payton v. New York*, 445 U.S., at 586. And "a warrant is generally required for a search of a home." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Therefore, courts to have addressed the issue within the proper context have repeatedly concluded that searches of houses, even if "administrative" in nature, require a warrant - - "a search without a warrant demands exceptional circumstances." *McDonald v. U.S.*, 335 U.S. 451, at 454-455 (1948).

*Second*, a fundamental purpose of the Amendment is "to protect against all general searches." *Go–Bart Importing Co. v. United States*, 282 U.S. 344, 357 (1931). And the dramatic scope of these searches, without any warrant or requirement of individualized probable cause, renders them general searches. Bedford's inspections were conducted to search for possible violations of a vast range of building specifications. Section 1311.30(a) of the Code made the sweeping scope of the inspections clear, specifically describing the inspections as "general inspections."

*Third*, "the suspicion-less search is one primary evil the Fourth Amendment was intended to stamp out." See *Boyd v. United States,* 116 U.S. 616, at 625–630 (1886). And of course, these searches are quintessentially "suspicion-less," unless one is willing to consider every sale or lease of a home inherently "suspicious." Homes are searched irrespective of their condition, irrespective of whether tenant or neighbor complaints have been lodged against the property or its owner, and even if a property owner were to voluntarily undergo and pass a private inspection from a non-governmental inspector.

*Finally*, "houses" are the exact type of property most explicitly and stringently protected by the Fourth Amendment. On this front, the Supreme Court is unmistakably clear: "a warrant is generally required for a search of a home." *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). Further, "[i]t is axiomatic that the '<u>physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed</u>." *United States v. United*

*States District Court,* 407 U.S. 297, 313 (1972). "And a principal protection against unnecessary intrusions into <u>private dwellings</u> is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. It is not surprising, therefore, that the [Supreme] Court has recognized, as 'a basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." *Welsh v. Wisconsin*, 466 U.S. 740, 748–749 (1984), citing *Payton v. New York*, 445 U.S., at 586.

In *Steagald v. U.S.*, the Supreme Court further explained "<u>the Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant</u>." 451 U.S. 204, at 212 (1981), citing *Payton v. New York, supra*, 445 U.S., at 590; see also *Coolidge v. New Hampshire*, 403 U.S. 443, 474–475 (1971); *Jones v. United States*, 357 U.S. 493, 497–498 (1958); *Agnello v. United States*, 269 U.S. 20, 32–33 (1925). These axioms, just like the Fourth Amendment's text, do not distinguish between houses that the owner desires to sell or those he or she wishes to continue to inhabit, lease, or rehabilitate. Consequently, "houses," as private dwellings, whether rental or owner-occupied, are entitled to the greatest level of constitutional protection, with respect to government searches.

In sum, the Fourth Amendment was ratified to guard against precisely the type of searches the City has mandated for decades. As such, Plaintiffs are entitled to judgment as a matter of law.

  *i.*  **The City's warrantless search mandates are "searches."**

*First*, the Fourth Amendment establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: when "the Government obtains information by physically intruding" on persons, houses, papers, or effects, "a 'search' within the original meaning of the Fourth Amendment" has "undoubtedly occurred." *United States v. Jones,* 132 S.Ct. 945, 950–951 (2012).

For this reason, courts analyzing the inspection of a dwelling or workplace do not entertain notions that the inspection could be something other than a "search," as contemplated by the Fourth Amendment. For instance, in *Mimics, Inc. v. Vill. of Angel Fire*, the Tenth Circuit Court of Appeals explained that inspections of property that "examine the interior of the premises" are searches:

 It is undisputed that on both occasions in question, Hasford sought entry to examine the interior of the premises . . . Even Hasford later stated that 'he intended to investigate whether Mr. Morrow should have

obtained a building permit, whether he had violated other building code requirements, and whether a stop work order should be issued.' Moreover, evidence of Hasford's behavior indicates that he was conducting inspections of the property.

394 F.3d 836, 842-45 (10th Cir. 2005).

Here, the interior inspections for criminal and civil code violations are "searches": the City of Bedford insists on physically intruding within private houses within the city for the purpose of obtaining information about all aspects of the interior of the house, garages, all fixtures, windows, doors, bathrooms, appliances, all lights, all locations containing electricity, and more. The breadth of these searches is demonstrated by the four-page inspection checklists used to guide the searches as well as the lengthy inspection reports. See Doc. 1-5, PageID 31-34; Doc. 21, PageID 207. And this information is then used to impose criminal, civil liability, and economic harm upon the homeowner.[6]

### ii. Bedford _coerces_ warrantless searches.

The Supreme Court affirms that "courts indulge every reasonable presumption against waiver of fundamental constitutional rights and that they do not presume acquiescence in the loss of fundamental rights," as "[a] waiver is ordinarily an intentional relinquishment or abandonment of a known right or privilege." *Jordan v. City of Bucyrus, Ohio*, 739 F. Supp. 1124, 1127–28 (N.D. Ohio 1990), citing *Johnson v. Zerbst,* 304 U.S. 458, 464 (1938). Further, "a search conducted over the objection of the owner of the premises sought to be searched is 'forcible,' whether or not violent means are used to effect the search;" and "[w]hen a prosecutor seeks to rely upon consent to justify the lawfulness of a search, he has the burden of proving that the consent was, in fact, freely and voluntarily given. This burden cannot be discharged by showing no more than acquiescence to a claim of lawful authority." Quoting, respectively, *U.S. v. Biswell,* 406 U.S. 311, at 319 and *Bumper v. North Carolina*, 391 U.S. 543 (1968); See also *State v. Taylor* 77 Ohio App.3d 223, at 226 (1991)("when the state attempts to justify a warrantless search on the basis of consent, the state must demonstrate that the consent was freely and voluntarily given and not the result of coercion, express or implied.")

---

[6] Meanwhile, it is axiomatic that anything within the city agent's plain view can serve as evidence in a non-property-related related criminal prosecution of the property owner and/or tenant.

Applying these principles to search requirements materially identical those *here*, the Ohio Supreme Court explained, "A valid consent involves a waiver of constitutional rights and cannot be lightly inferred; hence, it must be '<u>voluntary and uncoerced</u>, either physically or psychologically.'" *Wilson v. City of Cincinnati,* 46 Ohio St.2d 138, at 141 (1976), citing *United States v. Fike* (5th Cir., 1972), 449 F.2d 191, 193. Therefore, "where a municipal ordinance requires the owner of real property to tender a certificate of housing inspection to a prospective buyer, and such certificate may be obtained only by allowing a warrantless inspection of the property, the imposition of a criminal penalty upon the owner's *failure to tender the certificate* [separate and apart from his refusal to permit the inspection] violates the owner's rights under the Fourth Amendment to the United States Constitution." *Id.* Put otherwise, "the coercion represented by the sole alternative of possible criminal prosecution clearly negates any 'consent' which may be inferred from the allowance of the inspection and, therefore, the validity of such searches upon the basis of consent is not sustainable." *Id.*

Further, federal courts to have considered inspection requirements identical in operation to Bedford's longstanding requirements are clear that there can be no *voluntary* consent when there is no warrant procedure and the prospect of penalties is engrained in the text of the ordinance at issue, as here. In *Makula v. Village of Schiller Park,* the District Court for the Northern District of Illinois explained why such inspections are *inherently nonconsensual* and fail Fourth Amendment scrutiny on their face, even though the homeowners there, as here, proactively "applied" for the inspections:

> **The Village argues that an owner's application for a license for a multiple family dwelling *constitutes consent* to inspection.** However, in order to give a valid consent to a search, that consent must be voluntary. *Schneckloth v. Bustamonte,* 412 U.S. 218, 93 S.Ct. 2041 (1973). In determining voluntariness of the consent to the search, the totality of the circumstances must be considered. *Schneckloth v. Bustamonte,* 412 U.S. at 228. In *Schneckloth,* the court assumed that the (there, criminal) defendant had the right to refuse to grant the consent. Under this Ordinance, however, owners and managers of multiple family dwellings do not have that choice. If they wish to operate their buildings, they must give consent to administrative searches, to be conducted at the whim of the municipality. If they do not consent, they may not operate their buildings, period. **From the totality of these circumstances, it is clear that such a consent is not voluntary.**

Likewise, in *Hometown Co-Operative Apartments v. City of Hometown,* the Court considered an inspection scheme factually identical to Bedford's schemes, whereby the homeowner was obligated to apply for and schedule a time for the point of sale inspection ("the owner of the property <u>must apply</u> for a Certificate, agree in writing to a time during the regular working hours of the building department when the residence can be inspected, and pay a fee.

. .").  The Court concluded that the inspection requirement violated the Fourth Amendment on its face, holding as follows:  "under the principles of *Camara*,. . . [t]he Court finds further that the ordinance is unconstitutional under the fourth amendment insofar as it fails to provide for a warrant as a prerequisite for the point of sale inspection." 495 F.Supp., at 56-58 (1980).

Consequently, evidence of a Bedford homeowner or agent *contacting the City to schedule an inspection* is evidence of coerced compliance with a mandate, not voluntary consent.  The City cannot convert *acquiescence to a mandate* into *"voluntary consent"* simply by *ordering* the homeowner and/or his agent to "apply."  Thus, the acquiescence of Plaintiffs and others to the Point of Sale inspection mandates through proactively contacting the City to schedule inspections is an entirely foreseeable consequence of the implicitly coercive system the City has established, rather than evidence of truly voluntary consent.

Finally, it is no defense that Bedford's inspections are *indirectly* rather than *directly* coercive:  courts have declined to treat the choice between earning the full income of one's property and exercising constitutional rights as a meaningful choice.  See *e.g.*, *Wilson v. City of Cincinnati,* 46 Ohio St.2d 138 (1976); *Sokolov v. Village of Freeport*, 52 N.Y.2d 341 (1981) (holding that a property owner cannot be regarded as having voluntarily given consent to a search where the price he must pay to enjoy his rights under the Constitution is the effective deprivation of any economic benefit from his rental property.)  Ultimately, then, because the City's longstanding inspection policies were inherently coercive, acquiescence to those mandates cannot, as a matter of law, be deemed voluntary consent.  *Here*, the plain language of the Code confirms that Bedford's rental inspections are functionally identical to those held coercive in *Wilson*:  refusal to consent to a warrantless search results in criminal, civil, and economic penalties.

Further, summary judgment evidence before the Court negates any notion that the inspections are consensual on either a sweeping or individualized basis.  Mr. Pund's affidavit confirms that "while [has has] called the City of Bedford to initiate rental inspections (and paid the inspection fees) in the past, I have never done so voluntarily:  I have only done so because the City requires landlords to call and initiate  an inspection before a rental home can be inhabited.  I felt compelled and coerced to endure those inspections."[7]  Bedford homeowner Brenda Flask likewise

---

[7]     February 9, 2017 Declaration of Kenneth Pund, at Paragraph 7.

confirmed the coercive nature of the inspections.[8]  In response to Plaintiffs' Interrogatories requesting that the City identify each and every individual or business who has knowingly and voluntarily consented to a search, the City fails to identify a single individual, instead simply demurring that such "individuals and/or businesses entities are identified" in the over 5,000 pages of inspection reports Defendants delivered to Plaintiffs, which includes every single inspection performed during the relevant periods of time.  See Defendants' Response to Interrogatory No. 11 of Plaintiff Kenneth Pund.  When asked to supply "any and all evidence in support" of the foregoing Interrogatory Response, the Defendants simply repeat their answer that the evidence is *somewhere* within those 5,000 pages of inspection reports. See Defendants' Response to Interrogatory No. 12 of Plaintiff Kenneth Pund.  When asked to "identify, with detail and specificity as to each individualized situation, any and all exceptions to the warrant requirement that you believe applied," the Defendants had no response, simply again pointing to the 5,000 pages, and objecting that such a request was "overly broad and unduly burdensome."   See Response to Interrogatory No. 14.

However, "[w]hen a warrantless search has been conducted, *the state bears the burden* to establish that the search falls within one of the exceptions to the warrant requirement." *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454–455.  The City's non-specific referral to 5,000 pages of general records fails to meet that burden, just as vague references to homeowners' general acquiescence to authority fail.  Consequently, Bedford's inspections have been both warrantless and coercive.  Plaintiffs are therefore entitled to summary judgment on their Fourth Amendment claims.

### iii.  Warrantless <u>rental</u> inspections are generally unconstitutional.

When warrantless, rental inspections violate the Fourth Amendment on their face.  Seminal principles on the subject are established by the Supreme Court of the United States' 1967 decision in *Camara v. Municipal Court*. There, the Supreme Court held unconstitutional a San Francisco ordinance which permitted nonconsensual warrantless inspections of buildings and rental premises to ensure compliance with the city's housing code.  *Camara v. Municipal Ct.*, 387 U.S. 523 (1967).  As in the instant case, failure to consent to the warrantless, administrative

---

[8]        February 13, 2017 Declaration of Brenda Flask, at Paragraphs 6-8, 10-11, 13.

searches authorized by the ordinance was punishable as a misdemeanor. *Camara*, 387 U.S. at 527 n.2. The case arose after an apartment building tenant refused an annual inspection. *Id.*

The *Camara* Court held that "such searches when authorized and conducted without a warrant procedure lack the traditional safeguards with the Fourth Amendment guarantees to the individual." *Id.* at 534. The Court found applicable to that situation the governing principle that "except in certain carefully defined classes of cases, a search of private property without proper consent is 'unreasonable' unless it has been authorized by a valid search warrant." 387 U.S. at pp. 528–529. Further, since "the governmental purpose behind the search would not be frustrated by the burden of obtaining a warrant, and because administrative searches of the type there at issue involved significant intrusions upon the interests protected by the Fourth Amendment," the Court determined that such searches could not be made without the owner's consent unless a search warrant had first been obtained. *Id.* The Court explained its rationale, which carries considerable force here:

> [I]t is vigorously argued that the health and safety of entire urban populations is dependent upon enforcement of minimum fire, housing, and sanitation standards, and that the only effective means of enforcing such codes is by routine systematized inspection of all physical structures . . . *The question is not, at this stage at least, whether these inspections may be made, but whether they may be made without a warrant*. . . . In summary, we hold that administrative searches of the kind at issue here are significant intrusions upon the interests protected by the Fourth Amendment, that such searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees to the individual. . .
>
> ***
>
> We simply cannot say that the protections provided by the warrant procedure are not needed in this context; broad statutory safeguards are no substitute for individualized review, particularly when those safeguards may only be invoked at the risk of a criminal penalty.

See *Camara, supra*, at 533, 539, 540. Here, Bedford's compulsion of a warrantless point of sale inspection to facilitate a governmental search for housing code violations is materially indistinguishable from the administrative searches *Camera* found to be impermissible.

Since *Camara,* Court's have authoritatively and persuasively struck down warrantless search requirements tantamount to Bedford's point of sale inspection scheme. In *Baker v. Portsmouth,* decided by the Southern District of Ohio in October of 2015, Judge Dlott considered an inspection ordinance whereby "Inspections [of rental property] are conducted at least once a year and on a minimum of forty-eight hours' notice, unless the time period is waived by the tenant or occupant. . . The scope of the search is limited by the items on the dwelling inspection

checklist, a list of eighty search items divided into the following categories: exterior premises, common egress corridor, interior, kitchen/dining, hallways, laundry, basement/mechanicals, bedrooms, bathrooms, and other." *Baker v. City of Portsmouth*, No. 14-CV-512, 2015 WL 5822659 (S.D. Ohio Oct. 1, 2015).

There, as here, "Plaintiffs claim that the Code violates their Fourth Amendment rights by mandating warrantless inspections of their properties without probable cause." *Baker,* at p. 3. In response to this argument, the Court acknowledged the requisite analysis, explaining "[t]herefore, unless a recognized exception to the warrant requirement applies, the Code's failure to include a warrant provision violates the Fourth Amendment." *Baker,* at p. 5. The Southern District of Ohio ultimately agreed with the proposition that "the Code is unconstitutional as applied and on its face, because it mandates warrantless, coerced inspections of the interior of private homes without probable cause." *Id.*

In doing so, the Court took account of governing precedent, including that recently established by the Supreme Court in 2015: "[t]he Supreme Court has repeatedly held that 'searches conducted outside the judicial process, without prior approval by a judge or a magistrate judge, are *per se* unreasonable subject only to a few specifically established and well-delineated exceptions." *City of Los Angeles v. Patel*, 135 S.Ct. 2443, 2452 (2015). The Court then properly concluded as follows:

> "Guided by the above cases, the Court finds that the Portsmouth RDC violates the Fourth Amendment insofar as it authorizes warrantless administrative inspections. It is undisputed that the RDC affords no warrant procedure or other mechanism for precompliance review. As in the above cases, the owners and/or tenants of rental properties in Portsmouth are thus faced with the choice of consenting to the warrantless inspection or facing criminal charges, a result the Supreme Court has expressly disavowed under the Fourth Amendment. *See Camara*, 387 U.S. at 532. *See also Patel*, 135 S.Ct. at 2452 . . . . Therefore, unless a recognized exception to the warrant requirement applies, the Code's failure to include a warrant provision violates the Fourth Amendment."
> ***
> When balanced against the significant privacy interest and substantial intrusion thereon, the Court concludes that the warrantless inspections authorized by the Code are unreasonable under the Fourth Amendment. Having determined that the Code is not saved by special needs or the closely regulated industry exceptions, the Court concludes that the Code's failure to include a warrant provision violates the Fourth Amendment.

*Baker v. City of Portsmouth*, No. 1: 14CV5L2, 2015 WL 5822659, at 3-7 (S.D. Ohio Oct. 1, 2015).

Likewise, in the non-binding though highly persuasive case of *Sokolov v. Village of Freeport,* the Court of Appeals of New York (the State's Supreme Court) unanimously held that imposition of a penalty upon a landlord for leasing his or her premises without first consenting to a warrantless search violates the property owner's Fourth

Amendment rights. *Sokolov v. Village of Freeport*, 52 N.Y.2d 341, 420 N.E.2d 55 (1981) ("through an indirect method the property owner is being penalized for his failure to consent to a warrantless search. In this instance the property owner's consent is not voluntarily given, as it is clearly a product of coercion. <u>A property owner cannot be regarded as having voluntarily given his consent to a search where the price he must pay to enjoy his rights under the Constitution is the effective deprivation of any economic benefit from his rental property</u>.").

Finally, in *Dearmore v. City of Garland,* the Fifth Circuit Court of Appeals affirmed a District Court's application of *Camara* to invalidate warrantless housing code inspections akin to those sought by Bedford here. *Dearmore v. City of Garland,* 519 F.3d 517 (2008). The District Court there issued a preliminary injunction upon considering an ordinance, holding "*Camara* makes no distinction between owner and tenant, but rather holds that an administrative search of a private residence, including a private residence owned by one person and rented by another, must include a warrant procedure. . . <u>The court finds the City's reasoning unpersuasive because the property owner is being penalized for his failure to consent in advance to a warrantless search of unoccupied property. The property owner's consent thus is not voluntary at all</u>. . . The alternatives presented to the property owner are to consent in advance to a warrantless inspection, or to face criminal penalties; thus consent is involuntary. On the other hand, if the owner does not consent to the warrantless search, he does not receive a permit. The whole purpose of receiving a permit is to rent the property for commercial purposes. Without a permit, the owner cannot engage in lawful commercial activity. The owner is thus faced with equally unavailing situations." *Dearmore v. City of Garland,* 400 Supp.2d 894, 903 (N.D. Tex., 2005), citing *United States v. Santiago,* 410 F.3d 193, 198–99 (5th Cir.2005); *United States v. Olivier–Becerril,* 861 F.2d 424, 425 (5th Cir.1988).

*Camara, Baker, Sokolov,* and *Dearmore,* alongside the house search cases cited above, persuasively demonstrate that forced warrantless searches of houses (whether owner-occupied, tenant occupied, or unoccupied) for housing code violations violate the Fourth Amendment. Thus, binding and persuasive precedent striking down search requirements materially identical to Bedford's longstanding point of sale and rental searches demonstrates that Plaintiffs are entitled to judgment as a matter of law on their Fourth Amendment declaratory judgment claims.

*iv. Warrantless "<u>point of sale</u>" searches of houses are generally unconstitutional.*

Point of sale inspections of homes are challenged less frequently than rental inspections because sellers are unlikely to forestall the sale of their homes and prospective buyers lack the property interest to have standing to challenge the inspections. However, courts to have considered the issue also routinely conclude that such searches, in the absence of a warrant, violate homeowners' Fourth Amendment rights.

In *Wilson v. City of Cincinnati,* the Ohio Supreme Court confronted a local ordinance whereby "it can be seen that the homeowner, prior to entering into a contract for the sale of the property, is required to tender to the prospective buyer a Certificate of Housing Inspection. The failure to so comply, with three exceptions, renders the seller subject to the criminal penalty provided in subsection (F) and Ordinance No. 557-1973. <u>A critical aspect of the legislation, however, is that the seller can obtain the certificate only by agreeing to a time when an inspector is permitted access to the property,</u>" and "[o]bviously, the seller is faced with a serious dilemma; either he must consent to a warrantless search or face the possibility of a criminal penalty." *Wilson v. City of Cincinnati*, 46 Ohio St. 2d 138, 138-49 (1976). In response, the Court concluded as follows:

> [W]here a municipal ordinance requires the owner of real property to tender a certificate of housing inspection to a prospective buyer, and such certificate may be obtained only by allowing a warrantless inspection of the property, the imposition of a criminal penalty upon the owner's failure to tender the certificate violates the owner's rights under the Fourth Amendment to the United States Constitution.

*Wilson v. City of Cincinnati*, 46 Ohio St. 2d 138, 138-49 (1976). Consequently, the unconstitutionality of Bedford's Point of Sale inspection requirement is already clearly established in Ohio by binding precedent.

Federal courts to have considered the issue have followed suit. In *Makula v. Village of Schiller Park,* the District Court for the Northern District of Illinois explained why point of sale inspections fail Fourth Amendment scrutiny on their face: "Simply put, the power of municipal building, fire, health, and other similar officials to enter any building without permission for the performance of duties is, in the absence of an emergency, violative of the constitutional guarantees against unreasonable search and seizure, unless a search has been authorized by a valid search warrant." 1995 WL 755305*,* citing Eugene McQuillin, The Law of Municipal Corporations § 24.557 p. 174 (3d ed. 1989).

Likewise, in *Hometown Co-Operative Apartments v. City of Hometown,* the Court considered an inspection scheme factually identical to Bedford's scheme.[9] The Court concluded that the inspection requirement violated the Fourth Amendment on its face, holding as follows: "under the principles of *Camara*, the ordinance is unconstitutional insofar as it fails to provide for a warrant procedure. . . [t]he Court finds further that the ordinance is unconstitutional under the fourth amendment insofar as it fails to provide for a warrant as a prerequisite for the point of sale inspection." 495 F.Supp., at 58 (1980).

Consequently, courts to have analyzed warrantless point of sale inspections consistently recognize that they violate clear Fourth Amendment requirements. As such, precisely applicable precedent suggests that Plaintiffs are entitled to summary judgment on their Fourth Amendment claims as a matter of law.

### v. *Bedford's warrantless search mandates are unconstitutional on their face.*

The City of Bedford's original Point of Sale and Rental search mandates must be found unconstitutional *on their face,* rather than simply as applied to Plaintiffs. In *Patel,* the Supreme Court confirmed the viability of facial challenges to statutes such as these, explaining "We first clarify that facial challenges under the Fourth Amendment are not categorically barred or especially disfavored," and *"*The Court's precedents demonstrate not only that facial challenges to statutes authorizing warrantless searches can be brought, but also that they can succeed." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2449-2451 (2015)(Emphasis added). The Court then concluded "we hold that § 41.49(3)(a) is <u>facially</u> unconstitutional because it fails to provide hotel operators with an opportunity for precompliance review." *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2448 (2015). The statute there simply provided in pertinent part, that "hotel guest records 'shall be made available to any officer of the Los Angeles Police Department for inspection."[10] As the Supreme Court points out, these provisions will not apply when there is

---

[9]  495 F.Supp. 58, at 56, 57 (1980). ("The ordinance makes it unlawful for the owner of residential property to sell or lease the property without providing the buyer or lessee of the Property Certificate of Housing Inspection issued by the city building department within the three-month period before the parties sign the contract for sale or lease. In order to obtain a Certificate of Housing Inspection, the owner of the property must apply for a Certificate, agree in writing to a time during the regular working hours of the building department when the residence can be inspected, and pay a fee. Pursuant to the ordinance the building department inspects the residence for compliance with the Hometown building, housing, property maintenance, and zoning codes. Failure to comply with the ordinance results in a fine for each offense...")

[10]  *City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2448 (2015).

consent, an exigent circumstance, a warrant, or a subpoena, and therefore those applications are not part of the denominator - - only applications where the *statute itself* compels the search are relevant to the determination:

> [W]e consider whether § 41.49 falls within the administrative search exception to the warrant requirement. The Court has held that absent consent, exigent circumstances, or the like, in order for an administrative search to be constitutional, *the subject of the search must be afforded an opportunity to obtain precompliance review before a neutral decisionmaker*.
>
> ***
>
> <u>A hotel owner who refuses to give an officer access to his or her registry can be arrested on the spot. The Court has held that business owners cannot reasonably be put to this kind of choice.</u> *Camara,* 387 U.S., at 533
>
> * * *
>
> [W]hen assessing whether a statute meets this standard [of unconstitutional in all of its applications], *the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct*. . . Similarly, when addressing a facial challenge to a statute authorizing warrantless searches, *the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant.* If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. *Statutes authorizing warrantless searches also do no work where the subject of a search has consented.* Accordingly, the constitutional "applications" that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute

*City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2451-53 (2015)(Emphasis added). See also *Harrell v. City of New York,* No. 14-CV-7246 VEC, 2015 WL 5729582, at p. 10 (S.D.N.Y. Sept. 30, 2015); *Peraza v. State,* 467 S.W.3d 508, 515 (Tex. Crim. App. 2015); *Hardrick v. City of Detroit*, No. 15-13884, 2016 WL 692528, at 1-6 (E.D. Mich. Feb. 22, 2016).

Likewise, in *Baker,* Judge Dlott observed "[g]uided by the [] cases, the Court finds that the Portsmouth RDC violates the Fourth Amendment insofar as it authorizes warrantless administrative inspections. It is undisputed that the RDC affords no warrant procedure or other mechanism for precompliance review. As in the above cases, the owners and/or tenants of rental properties in Portsmouth are thus faced with the choice of consenting to the warrantless inspection or facing criminal charges, a result the Supreme Court has expressly disavowed under the Fourth Amendment." *Baker,* at. P. 5. This result comports with the rulings on housing inspection mandates cited above. See also *Garner Properties & Mgmt. v. Charter Twp. of Redford*, No. 15-14100, 2017 WL 3412080, at 11 (E.D. Mich. Aug. 8, 2017)("Although Garner Properties brings both facial and as-applied challenges, this Court need not address the as-applied challenge, as Garner Properties' facial challenge survives summary judgment"). *Landon v. City of Flint*, No. CV 16-11061, 2016 WL 7661390, at 5 (E.D. Mich. Nov. 30, 2016), report and recommendation adopted, No. CV 16-11061, 2017 WL 345854 (E.D. Mich. Jan. 24, 2017)( "Landon is likely to succeed on his claim

that Flint's Inspection Code and other codes adopted within Ordinance 3707 violate the Fourth Amendment because they do not provide a warrant or precompliance review process for routine inspections.").

One Ohio Appellate Court aptly addressed the issue in converting the trial court's holding from unconstitutional *as-applied* to unconstitutional *on its face:* "[t]he trial court held that the ordinance was unconstitutional as applied to Finnell. * * * The current scheme that coerces owners into consent is not a permissible exception to the warrant requirement. *Wilson, supra; Camara, supra.* Therefore, we affirm the judgment of the trial court, with the modification that the C.M.C. 1101.62.1 requirement that Finnell submit to a CBID inspection or face prosecution under C.M.C. 1101.61.3 and 1101.54.1 is *facially* unconstitutional, rather than only as applied to Finnell." *State v. Finnell*, 115 Ohio App. 3d 583, 583-91 (1996).

Accordingly, the City's longstanding inspection requirements are coercive in *all of applications* because they are only *actually employed* when coercion becomes necessary. Thus, Plaintiffs are entitled to judgment as a matter of law in all cases where the inspection requirement were applied to class members, i.e. on their claim that the City of Bedford's original Point of Sale and Rental inspection requirements were *facially* unconstitutional. The ordinances' search authorizations and attendant requirements, including fees that fund the searches, must therefore be declared unconstitutional in their entireties.

**B.  Plaintiff-Class Members are entitled to restitution.**

Inspections fees paid by class members must be returned to them.

*i.      This Court maintains the authority to award restitution here.*

"Courts have broad equitable power to fashion appropriate remedies for adjudicated constitutional and statutory violations." *See Walker v. Toledo,* 2013-Ohio-2809, citing *Swann v. Charlotte–Mecklenburg Bd. of Educ.,*402 U.S. 1, 15–16, (1971) ("Once a right and a violation have been shown, the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies."); *Carter–Jones Lumber Co. v. Dixie Distrib. Co.,* 166 F.3d 840, 846 (6th Cir.1999)("[A] court of equity has traditionally had the power to fashion any remedy deemed necessary and appropriate to do justice in a particular case.").

In *Santos v. Ohio Bur. of Workers' Comp*, the Ohio Supreme Court explained that a suit that seeks the return of specific funds wrongfully collected or held by government is brought in equity, and a court may properly exercise jurisdiction over the matter. *San Allen, Inc. v. Buehrer*, 11 N.E.3d 739, 2014 -Ohio- 2071, citing *Santos v. Ohio Bur. of Workers' Comp.*, 101 Ohio St.3d 74, 2004-Ohio-28, at Paragraph 17. In *Walker*, "[t]he allegation of appellant [was] that the city's collection of automated fines was wrongfully premised on an unconstitutional ordinance. This is in the nature of those actions held to be permitted." *Walker*, supra. Numerous other recent cases have similarly recognized that where, as here, a government actor or agency "collects money to which it is not entitled, an action to recover those funds is generally considered a claim for equitable restitution." *See, San Allen, Inc. v. Buehrer*, 11 N.E.3d 739, 2014 -Ohio- 2071, citing *e.g., Ohio Hosp. Assn. v. Ohio Dept. of Human Servs.*, 62 Ohio St.3d 97, 104–105 (1991)(order to reimburse Medicaid providers for amounts unlawfully withheld pursuant to administrative rules improperly promulgated by the Ohio Department of Human Services was "not an award of money damages, but equitable relief"); *Interim HealthCare*, 2008-Ohio-2286, at ¶ 17 ("Cases in which a plaintiff claims a state agency has wrongfully collected certain funds are characterized generally as claims for equitable restitution."), citing *Morning View Care Center–Fulton v. Ohio Dept. of Job & Family Servs.*, 2004-Ohio-6073, ¶ 19; *Dunlop v. Ohio Dept. of Job & Family Servs.*, 2012-Ohio-1378, ¶ 13–16 (claim for reimbursement of child support payments that child support agency allegedly wrongly collected in excess of child support payments ordered by the common pleas court was a claim for equitable restitution). Thus, this Court may reimburse Plaintiffs and all other homeowners through use of its general equitable authority.

ii.      *This Court should award restitution here.*

There are compelling reasons for awarding. *First*, federal courts maintain full authority to order equitable restitution in response to unconstitutional exactions: ordering such a refund "is every bit as much of a federal question as what particular federal constitutional provisions themselves mean," and denial of restitution has even been characterized as "irreparable injury." *Am. Trucking Ass., Inc. v. Gray*, 483 U.S. 1306, 1309 (1987). Accordingly, federal courts have ordered Ohio cities to make restitution. In *Jordan v. City of Bucyrus, Ohio*, the plaintiffs in a Section 1983 case brought a "civil rights action challenging the constitutionality of the defendant City's collection of union agency fees from them," claiming they were "entitled to full refund of all agency or

service fees withheld." *Jordan v. City of Bucyrus, Ohio,* 739 F.Supp. 1124, 1127-1128 (N.D. Ohio 1990). The Court responded with a "grant of restitution" for unconstitutional seizures of the plaintiffs' funds. *Id.*[11]

Indeed, "rights passing through the Section 1983 prism may in proper cases be vindicated by . . . orders of restitution." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, at 751-52 (1999). Accordingly, in Section 1983 litigation similar to this case, federal courts have ordered restitution. After certifying a class of such plaintiffs, the Court in *Samuel v. Univ. of Pittsburgh* held that "restitution is due any woman who paid the higher out-of-state tuition rate solely by reason of the application of the unconstitutional residency rules," as "the Universities were unjustly enriched in that they wrongfully secured a benefit which it would be unconscionable for them to retain," because they "obtained the excess fees from the class under the pretext that the exaction was legal." 538 F.2d 991, 994, 995 (3d Cir. 1976). And in *Allen v. Leis,* Judge Spiegel, in Section 1983 facial challenge, certified a class of all plaintiffs who were seeking "restitution of all funds illegally taken" by way of unconstitutional "$30.00 book-in-fees." 204 F.R.D. 401 (S.D. Ohio 2001).[12]

*Second,* the Supreme Court suggests that it violates the Due Process Clause of the Fourteenth Amendment when state and local government fails to make restitution in cases such as this: "the Due Process Clause of the Fourteenth Amendment *obligates* states to provide meaningful backward-looking relief to rectify any unconstitutional deprivation" since payments made under the duress of an unconstitutional enactment require "a refund" by way of restitution. *McKesson Corp. v. Div. of Alc. Bev. and Tobacco, Dept. of Business Reg. of Florida,* 496 U.S. 18 (1990). See also *Ward v. Love County Board of Comm'rs,* 253 U.S. 17 (1920) (reversing refusal to award a refund for an unconstitutional tax); *Carpenter v. Shaw,* 280 U.S. 363, 369 (1930) (denial by state court of recovery of funds exacted in violation of the Constitution by compulsion "is itself in contravention of the Fourteenth Amendment."); *Montana National Bank of Billings v. Yellowstone County,* 276 U.S. 499, (1928)("undoubted right to recover" funds paid pursuant to unlawful exaction).

Thus failure to make restitution, for unconstitutional exactions likely violates Due Process principles. Meanwhile, a set of plaintiffs in state court were recently held "entitled to recover from defendant [Cuyahoga County] the full amount of [unconstitutional] sewer tap-in/connection fees paid by the plaintiffs to the [County]"

---

[11]     Also relevant to this Court, in *Jordan* the Northern District ordered "nominal damages."
[12]     This case is highly instructional for this Court's consideration of whether to certify Plaintiffs' proposed class.

23

because to hold otherwise would result in "an unlawful taking of property in violation of their constitutional rights." *Engelman v. Budish,* 2015-Ohio-1153, ¶ 11-13.

For all of these reasons, the District Court in *Baker v. City of Portsmouth* refused to dismiss the Plaintiffs' claim for restitution of unlawful rental inspection fees there, resulting in the parties ultimately settling the restitution claim. See <u>Baker v. City of Portsmouth</u>, No. 1: 14CV5L2, 2015 WL 5822659, at 8 (S.D. Ohio Oct. 1, 2015)("Plaintiffs seek relief in the form of the restitution of inspection fees related to unconstitutional inspections. Because Plaintiff seeks equitable relief the City is not entitled to immunity on the unjust enrichment claim").

Here, the City has collected money to which it is not entitled. Accordingly, equity warrants the return of ill-gotten gains in the form of inspection fees derived to fund unconstitutional inspections. Homeowners were forced to *fund* the unlawful warrantless governmental inspections of their private homes: "The fee for the *Point of Sale* inspection varies from $50 for single-family dwelling plus $25 for each additional rental unit; commercial buildings are a minimum fee $75 and maximum fee $200." Doc. 1-2, PageID 22. As to rental inspections, "a yearly fee of $50 per SINGLE-family, $75 for TWO-family, $100 for THREE family dwelling unit. . . or the amount of $20 per suite in a structure with FOUR or more apartments" was due at the time of the required applications. Doc. 21, PageID 204.

That the fees funds the unlawful inspections is indisputable as a matter of both law and evidence: in response to Plaintiffs' Interrogatories requesting identification of all accounts to which point of sale inspection fees and rental inspection fees were allocated, the City responded "The City of Bedford pays inspectors to conduct rental inspections" and "The City pays inspectors to conduct point of sale inspections." See Response to Interrogatory No. 5 of Kenneth Pund and Response to Interrogatory 5 of John Diezic. Thus, the City has collected money to which it is not entitled. Accordingly, equity warrants the return of ill-gotten gains in the form of inspection fees derived to fund unconstitutional inspections.

Finally, the amount of ill-gotten gains is established by reliable summary judgment evidence. The October 12, 2017 Affidavit of Paralegal Brandy Fitch affirms that, after reviewing all evidence in light of the Court's rulings, Ms. Fitch confirmed the existence of 376 distinct members of Subclass A (Point of Sale inspections) and 194 distinct members of Subclass B (Rental inspections). Utilizing proper methodology, Ms. Fitch was further able to

confirm that a total of $23,575 in unlawful inspection fees were paid by the members of Subclass A, while $38,125 in unlawful inspections fees were paid by the members of Subsclass B.

For the foregoing reasons, Plaintiffs and/or Class Members are entitled to restitution in the form of the return of their $61,700 in unlawfully-coerced inspection fees.

## IV.   CONCLUSION

The City of Bedford's original and longstanding mandatory warrantless point of sale and rental searches, unduly infringed upon Plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights.  And the inspection regime's fee, permitting, and licensing requirement are each dependent upon and intertwined with the unlawful inspection requirement.

Because no genuine issues of material fact exist on these issues and Plaintiffs are entitled to judgment as a matter of law, this Court must declare the inspections and their attendant fees unconstitutional, while ordering the City to make a total of $61,700 in restitution to the 570 members of the two certified subclasses.

Respectfully submitted,

*/s/ Maurice A. Thompson*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
122 E. Main Street
Columbus, Ohio 43215
Tel: (614) 340-9817
*MThompson@OhioConstitution.org*

Sheldon Berns (0000140)
Berns, Ockner & Greenberger, LLC
3733 Park East Drive, Suite 200
Beachwood, Ohio 44122
Tel: (216) 831-8838, Ext. 205
Fax: (216) 464-4489
*SBerns@BernsOckner.com*

Christopher Finney (0038998)
Finney Law Firm, LLC
4270 Ivy Pointe Boulevard, Suite 225
Cincinnati, Ohio  45245
(513) 943-6660 phone
*Chris @Finneylawfirm.com*

## Local Rule 7.1(f) Certification

As a certified class action lawsuit adjudicating fundamental constitutional rights, this case qualifies as "complex" and is therefore subject to the page limitation governing "complex" cases. Counsel certifies that this Motion and Memorandum is within that page limitation.

Respectfully submitted,

/s/  Maurice A. Thompson
Maurice A. Thompson (0078548)

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Motion for Partial Summary Judgment has been served on Defendants, through the Court's filing system email on October 12, 2017

Respectfully submitted,

/s/  Maurice A. Thompson
Maurice A. Thompson (0078548)