# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| **KENNETH PUND,** *et al.* | : | **Case No. 16-CV-1076** |
| | : | |
| **Plaintiffs,** | : | **Judge Benita Y. Pearson** |
| | : | |
| **v.** | : | |
| | : | **MEMORANDUM IN REPLY TO** |
| **CITY OF BEDFORD, OHIO,** *et al.* | : | **DEFENDANTS BRIEF IN OPPOSITION** |
| | : | **TO PLAINTIFFS' MOTION FOR** |
| **Defendants.** | : | **SUMMARY JUDGMENT** |

Nothing in the City of Bedford's November 2, 2017 Opposition to Plaintiffs' Motion for Summary Judgment alters the following realities: (1) the City's longstanding warrantless Point of Sale and Rental Inspection mandates were unconstitutional on their face; (2) Class members are entitled to restitution commensurate with inspection fees paid to the City.

## A. Plaintiffs' claims are not moot.

The City heavily relies upon the Sixth Circuit's 2004 decision in *Brandywine, Inc. v. City of Richmond* for the proposition that Plaintiffs' claim for declaratory relief upon the City's longstanding warrantless search mandates are moot, arguing "the Sixth Circuit clearly found that the constitutional challenge to the municipal zoning ordinance could be rendered moot due to the ordinance's amendment despite the fact that the plaintiffs also alleged monetary damages." Doc. 46, PageID 486-488, citing *Brandywine, Inc. v. City of Richmond*, 359 F.3d 830 (2004). The City further claims that the Sixth Circuit's statements of law in *Ermold v. Davis* are irrelevant due to the differing facts of that case. Doc. 46, PageID 488-490.

However, addressing the constitutionality of the City's longstanding search mandates in the process of concluding the extent to which Plaintiffs are entitled to restitution and nominal damages is perfectly consistent with the purposes of Declaratory Judgment. The test for mootness applied to a claim for declaratory relief "is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and

reality to warrant the issuance of a declaratory judgment." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. at 127, 127 S.Ct. 764 (2007).

*First*, the Sixth Circuit has clearly held - - subsequent to *Brandywine* - - that the constitutionality of prior government policies must be determined when Plaintiffs maintain a claim for "nominal damages,"[1] much less the meaningful restitution sought here.  The Sixth Circuit's *most recent* discussion of mootness affirms that this Court must address the constitutionality of the City's original inspection mandates.  *Ermold v. Davis* is notable *not because of its facts,* but precisely because it does *not* break new ground and instead simply recites the current state of the Sixth Circuit's precedent on mootness subsequent to a government's amendment of a challenged policy. 855 F.3d 715 (6th Cir. May 2, 2017). In *Ermold,* the Sixth Circuit panel chronicled binding precedent as follows:

> We have similarly held that although "the repeal or amendment of a law moots challenges to the original law ... [t]he existence of [a] damages claim preserves the plaintiffs' backward-looking right to challenge the original law and to preserve a live case or controversy over that dispute." *Midwest Media Prop., L.L.C. v. Symmes Twp*., 503 F.3d 456, 460–61 (6th Cir. 2007). *See also Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 581 (6th Cir. 2012) ("However, if the plaintiff's complaint includes a claim for damages, that claim 'preserves the plaintiff['s] backward-looking right to challenge the original law and to preserve a live case or controversy over that dispute.' ") (quoting *Midwest Media*, 503 F.3d at 461); *Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 824 (6th Cir. 2005) (holding that a court's order invalidating part of a city billboard ordinance did not moot a claim for damages arising from that invalidated portion of the ordinance).

*Id.*, at p. 3 (6th Cir. May 2, 2017)(citations included, emphasis added).

Likewise, in *Miller v. City of Cincinnati*, the City of Cincinnati argued that the plaintiffs' claims were moot because the City revised its policy.  622 F.3d 524, (6th Cir. 2010).  The Court specified that "[n]evertheless, the plaintiffs' claims remain viable to the extent that they seek nominal damages as a remedy for past wrongs." *Id.*  The Court explained further that "Because nominal damages are a symbolic remedy for *past* wrongs, a prayer for nominal damages precludes a finding of mootness*, even when the defendant has altered or abandoned the allegedly unconstitutional policy forming the basis for the plaintiff's complaint*.  *Id.*  On remand, Judge Barrett further explained that "this Court has subject matter

---

[1]    The Supreme Court has discussed the concept of "nominal" damages for violations of constitutional rights in *Carey v. Piphus*, 98 S. Ct. 1042, 1053–54 (1978).

jurisdiction over Plaintiffs' claims for nominal damages," and accordingly "the Court now turns to the merits of Plaintiffs' free speech claim under the First Amendment." *Miller v. City of Cincinnati,* No. 1:08CV550, 2012 WL 3962787, at pp. 6–8 (S.D. Ohio Sept. 11, 2012).

In *Ohio Citizen Action v. City of Englewood,* the Court *again* specifically addressed the subject of whether challenges to an Ohio city's policies are moot once the city alters those policies. The Court again reiterated the axiom that "If the plaintiff's complaint includes a claim for damages, that claim preserves the plaintiff['s] backward-looking right to challenge the original law and to preserve a live case or controversy over that dispute," in concluding that "the plaintiff's] damages claim relating to the enforcement of the curfew provision preserved its "backward-looking right to challenge" the 2004 Ordinance." The Court further observed that the Englewood's "voluntary cessation of its former policies" failed to moot the case. *Id*., at 583. Similarly, in *Midwest Media,* the Sixth Circuit explained as follows: "In most cases, the repeal or amendment of a law moots challenges to the original law. But, in this case, plaintiffs sought money damages arising from the township's failure to approve their nine sign applications. The existence of this damages claim preserves the plaintiffs' backward-looking right to challenge the original law and to preserve a live case or controversy over that dispute." *Midwest Media Prop., L.L.C. v. Symmes Twp., Ohio*, 503 F.3d 456, 460–61 (6th Cir. 2007).

The foregoing passages are binding precedent from Sixth Circuit decisions *subsequent to* the Sixth Circuit's 2004 decision in *Brandywine, Inc. v. City of Richmond, Kentucky* - - the only authority upon which the Defendants rely. 359 F.3d 830, at 835-37 (6th Cir. 2004). Accordingly, other Courts within the Southern District have not hesitated to address the constitutionality of warrantless housing inspection policies even after a warrant requirement has been added during the litigation. See *Baker v. City of Portsmouth*, No. 1: 14CV5L2, 2015 WL 5822659, at p. 2 (S.D. Ohio Oct. 1, 2015).

*Second,* Defendants argument that Plaintiffs' *declaratory judgment* claim is moot is a semantic distinction without a difference. In *Blau v. Fort Thomas Pub. Sch. Dist.,* the Sixth Circuit explained that whether that plaintiff's "matriculation from middle school to high school mooted the claim for injunctive

3

and declaratory relief" is "a point we need not decide" because "the existence of a damages claim ensures that this dispute is a live one and one over which Article III gives us continuing authority."  401 F.3d 381, at 387 (6th Cir. 2005).  Pursuant to this understanding, even in *Brandywine,* the Sixth Circuit did in fact declare the constitutionality of the policy to reach the plaintiff's damages claim - - the very thing Plaintiffs seek here.  *Brandywine,* supra., at 837 (holding that the City's zoning regulations withstood First Amendment scrutiny with respect to the claims made in that case).

*Finally*, the City's argues that the Plaintiffs' claim for declaratory judgment is moot because Plaintiffs' claim for *restitution* "stems from the conduct of the inspectors not from the constitutionality of the constitutionality of the ordinances themselves," and "Plaintiffs seek restitution under a theory of unjust enrichment, a theory which does not require a finding that the defendant has acted improperly." Doc. 46, PageID 488-490.  The City fails to substantiate these claims.  There is no precedent in support of these viewpoints.  And for the reasons articulated in the discussion of restitution below and in Plaintiffs' Motion for Partial Summary Judgment, these viewpoints are simply mistaken, i.e. Plaintiffs are entitled to restitution *precisely because* they were forced to fund unconstitutional inspections pursuant to an unlawful search mandate.

Applied here, the foregoing precedent demonstrates that the City of Bedford's "change in conduct," by way of amending its mandatory Point of Sale and Rental Inspection policies to include a warrant requirement, does not moot any of Plaintiffs' claims:  Plaintiffs clearly posit viable claims for both damages *and* restitution.  To adjudicate these claims - - which sufficiently "form the basis for a substantial controversy, particularly when taking into account particularly the City's litigation-induced amendments and continued *defense* of its original warrantless search mandates[2] - - this Court is required

---

[2]      Not long ago in *Ohio Citizen Action v. City of Englewood*, the Sixth Circuit reiterated that "a defendant's voluntary cessation of allegedly unlawful conduct ordinarily does not suffice to moot a case," and instead, the defendant bears "the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur."  The City *continues to defend the constitutionality* of the challenged ordinances.  Doc. 46, PageID 488.  The City provides no evidence indicating that it will not renew its warrantless search polices once this litigation has concluded.  To the contrary, the Affidavit of City official Mike Mallis insists that warrantless searches such as those at issue here

to adjudicate the constitutional contours of the original ordinance.  Accordingly, Plaintiffs' claims that the City's original warrantless search mandates are unconstitutional on their face are not moot.  See *Floyd v. Laws*, 929 F.2d 1390, 1401 (9th Cir.1991)("either actual or  nominal damages must be awarded if a plaintiff proves a violation of his Fourth Amendment rights.").  Consequently, this Court should still declare the City of Bedford's *original* policies to be unconstitutional on their face.

**B. The City's longstanding rental inspection mandates violate the Fourth Amendment on their face.**

The City now claims that its prior *Rental* Inspection Mandates withstand constitutional scrutiny pursuant to the following arguments:  (1) only the *owner* of the subject property is subjected to penalty for failure to obtain a mandatory rental inspection and "the Rental Inspection Ordinance did not impose any penalties upon tenants, just the owners of the property;" (2) the City "routinely obtain[s] consent from the tenant occupying the unit;" and "the evidence demonstrated by Bedford is that in all situations where a tenant occupies the premises, Bedford obtains an uncoerced consent to inspect the dwelling;" (3) property owners "have a diminished right of privacy in the premises they rent to others," thereby depriving them of the "capacity to claim the protection of the Fourth Amendment" since as "the Plaintiff landlords do not have a reasonable expectation of privacy in the invaded space;" and (4) Plaintiffs facial challenge is subject to *Salerno* analysis and pursuant thereto Plaintiffs have failed to carry their burden ("Plaintiffs cannot demonstrate the tenants refused entry to Bedford's inspectors").  Doc. 46, PageID 491-494.  Each of these arguments fails.

*i. The Plaintiffs here maintain a constitutionally protected interest.*

*First*, the City's attempt to graft a "reasonable expectation of privacy test" on top of the proper analysis here misses the mark.  Defendants rely on precedent prior to the United States Supreme Court's 2012 clarification of the test governing Fourth Amendment guarantees in *United States v. Jones.*  The

---

are "a vital tool used to maintain the health, safety and welfare of the citizens of Bedford…"  Doc. 46-1, PageID 501 (See Paragraphs 3).

Court clarified that the Amendment is first and foremost a protection of property, including "houses," against government trespass. Thus, a straight-forward application of the *Katz* "reasonable expectation of privacy" test is inappropriate here because that test is *in addition to* the Fourth Amendment's property-related protections that apply here: the reasonable expectation of privacy test applies in situations where there is *no* property right, as opposed to here. As the Court explained, "Fourth Amendment rights do not rise or fall with the *Katz* formulation" (the "reasonable expectation of privacy" test). And The *Katz* reasonable-expectation-of-privacy test has been added to, but not substituted for, the common-law trespassory test." *Jones*, supra. (Syllabus)(*Katz* added to the baseline the "expectations" test where no intrusion on property takes place, *Katz* "does not subtract anything from the Amendment's protections 'when the Government *does* engage in [a] physical intrusion of a constitutionally protected area.") To this end, the Supreme Court explains "[w]e [do not] believe that *Katz,* by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home." *Alderman v. United States*, 394 U.S. 165, 176 (1969).

Applying the Supreme Court's reasoning, the Ninth Circuit Court of Appeals *en banc* decision in *Patel* - - which the Supreme Court upheld - - concluded that where a hotel owner maintains "a possessory and an ownership interest," and "by virtue of those property-based interests, it has the right to exclude government searches . . . As to the property-based rationale for our holding, . . . the dissent is in complete agreement." *Patel v. City of Los Angeles,* 738 F.3d 1058 (9th Cir. 2014). The Court further clarified that "[w]e do not believe business owners are required to prove that [their property is subject to a reasonable expectation of privacy], any more than homeowners are required to prove that papers stored in a desk drawer are subject to a reasonable expectation of privacy. So long as a business's records are 'private,' as the Court held in *Hale,* 201 U.S. at 76, they fall within the scope of the 'papers' protected by the Fourth Amendment." *Id.* The Court then concluded that "No one contests here that plaintiffs' hotel records are in fact private. . . if the records were publicly accessible, the police of course would not need to rely on [the local warrantless search ordinance at issue] to gain access to them." *Id.*

6

Likewise here, Plaintiffs' "houses" are indisputably private:  they are not "publicly accessible." Thus, Defendants are mistaken to rest their advocacy of warrantless house searches solely on presence or absence of property owners' "expectations" and/or "privacy."

*Second*, Plaintiffs' position here is highly distinguishable from that of a landlord in a run-of-the-mill case featuring a spontaneous criminal search of a tenant in his or her rental home:  here, it is *the Plaintiff-homeowner* who is the target of the search, it is the Plaintiff-homeowner who is subjected to potential criminal liability in relation to the search, and it is Plaintiff-homeowner who is faced with loss of property rights and financial ruin if the searches are not performed.  Moreover, it is Plaintiff-homeowner, and not the tenant, who is forced to consent to the search.  Accordingly, with respect to administrative and regulatory searches, "*Camara* makes no distinction between owner and tenant, but rather holds that an administrative search of a private residence, including a private residence owned by one person and rented by another, must include a warrant procedure. . . *the property owner is being penalized for his failure to consent in advance to a warrantless search.*"  *Dearmore v. City of Garland*, 400 F.Supp.2d 894, at 902 (N.D. Tex. 2005)(reasoning approved by the First Circuit on appeal).  The landlord's rights are implicated because "[t]he alternatives presented to the property owner are to consent in advance to a warrantless inspection, or to face criminal penalties; thus consent is involuntary. On the other hand, if the owner does not consent to the warrantless search, he does not receive a permit. The whole purpose of receiving a permit is to rent the property for commercial purposes. Without a permit, the owner cannot engage in lawful commercial activity. The owner is thus faced with equally unavailing situations." *Dearmore,* supra., at 902.

*Third*, homeowners *do in fact* maintain a reasonable expectation of privacy in their houses when those houses are vacant.  *Dearmore,* supra., at 902 ("The court determines that in order to comply with the requirements of *Camara* and the protections of the Fourth Amendment, the Ordinance must give the landlord the opportunity to refuse to consent if the property is unoccupied and include a warrant procedure to be followed in the event the landlord refuses").  At minimum, rental houses in this context

are commercial property, the search of which requires a warrant.  And this distinction is relevant because the City's rental inspection policy insists upon searching Plaintiffs' houses *when they are unoccupied.*

### ii. As a matter of law and evidence, the consent exception to the warrant requirement is inapplicable here.

Next, the City makes the audacious claim that "Bedford's building inspectors, however, routinely obtain consent from the tenant."  Doc. 46, PageID 491.  This claim is fallacious.

*First*, as "evidentiary" support, the City solely relies on a claim falling far short of standing for such a proposition:  the affidavit of Calvin Beverly says nothing more than "neither I nor any other city inspector has encountered a situation where a tenant did not consent to the inspection of the dwelling . . . in which the tenant resided."  *Id.*, citing Doc. 46-2, PageID 507.  But these are two distinctively different statements.  The former is a deceptive interpretation of the latter, while the latter is a deceptive interpretation of reality:  as a matter of law and summary judgment evidence tenants are entirely cut out of the City's longstanding rental inspection process, and therefore play no role in consenting and/or whether consent is voluntarily provided.

*Second*, the City's own publications on the "Rental Program" confirm this, while also confirming that the *tenants are not present* when the searches are performed.  Speaking to the landlords, the City indicates:  "You must schedule an inspection prior to each new tenant.  Please call the Building Department to schedule a rental inspection."  Doc. 21, PageID 204.   Later, the City reiterates "You are required to call for a rental inspection.  *Id.*  And "the code requires you, as the owner, to make the proper application."  Id.  Further, "Tenants need to be issued a certificate of occupancy prior to inhabitation," and "the inspection should be done when the suite is still empty."  *Id.*  The City's publication also confirms that *when present*, tenants' consent plays no role in the process:  again speaking to the property owner, the City indicates "you must make the necessary arrangements with the tenant to open their suite to the inspector on a pre-arranged date."  *Id.*  Indeed, the City's publications simply confirms the law coercing the landlords to initiate the inspections irrespective of tenants' consent.  Section 1311.31 requires that "the owner . . . shall apply . . . if such structure is proposed to be occupied," and "in no event shall the unit or

8

structure be occupied in whole or in part until such certificates have been issued."  Doc. 21, PageID 202.

Further, "failure to apply shall be deemed a violation of this building code," and "no person shall reside in

any unit" in the interim.  Id.  Section 1311.32 adds that the inspection fee must be paid before the

inspection takes place.  *Id.*  Meanwhile, the City has confirmed that no such owner has ever been

penalized for any such failure to comply, from which one can infer that no tenant has been "cold-called,"

over the landlord's objection, for consent to search an occupied rental property.  See Doc. 54-1, PageID

421 (Defendants' Responses to Interrogatories 8-10:  no property owner has "failed to undergo an

inspection")

Thus, as a matter of law and evidence, there is *never* an occasion upon which the City has

approached or would approach the tenant for consent to perform a rental inspection without first having

coerced property owners such as the Plaintiffs to (1) provide consent; and (2) coerce the consent of their

tenants (where they are even present) so as to "arrange for" the inspection; and (3) fund the inspection by

paying the inspection fee.  The warrantless interior inspection of the private home, whether tenant

occupied or vacant, is a foregone conclusion by the time any tenant interacts with the City.

*Third,* upon Summary Judgment, "the nonmoving party must present 'significant probative

evidence' that will reveal that there is more than 'some metaphysical doubt as to the material

facts.'" *Moore v. Philip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993).  And "[o]nce the moving party

has met its burden of production, the nonmoving party then must go beyond the pleadings and by

affidavits, or by 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts

showing that there is a genuine issue for trial.'" *Id.*  Meanwhile, "when a warrantless search has been

conducted, the state bears the burden to establish that the search falls within one of the exceptions to the

warrant requirement." *Coolidge v. New Hampshire* (1971), 403 U.S. 443, 454–455.

Here, the City has failed to produce specific evidence as to the identity of the tenants that have

supposedly "consented" without coercion, much less the specific inspections that were supposedly

consensual.  Thus, Defendants have failed to meet their burden on summary judgment as well as under the

Fourth Amendment.  Indeed, Mr. Pund's November 16, 2017 Declaration confirms the absence of tenant consent.  And in response to Plaintiffs' Interrogatories requesting that the City identify each and every individual or business who has knowingly and voluntarily consented to a search, the City fails to identify a single individual, instead simply demurring that such "individuals and/or businesses entities are identified" in the over 5,000 pages of inspection reports Defendants delivered to Plaintiffs, which includes every single inspection performed during the relevant periods of time.  See Doc. 45-1, PageID 422 (Defendants' Response to Interrogatory No. 11).  When asked to supply "any and all evidence in support" of the foregoing Interrogatory Response, the Defendants simply repeat their answer that the evidence is *somewhere* within those 5,000 pages of inspection reports.  *Id.,* at Response to Interrogatory 12.  When asked to "identify, with detail and specificity as to each individualized situation, any and all exceptions to the warrant requirement that you believe applied," the Defendants had no response, simply again pointing to the 5,000 pages, and objecting that such a request was "overly broad and unduly burdensome."  *Id.,* at Response to Interrogatory No. 14.  Thus, all law and summary judgment evidence demonstrates that tenant consent is not an option and no examples of tenant consent exist.[3]

*Finally*, *even if a tenant were to consent*, the City's policies plainly do coerce such consent on their face.  Section 1311.28 indicates "Whoever violates any provision of this Chapter . . . shall be fined . . . or imprisoned . . . "  Doc. 1-3, PageID 29.   Likewise, Section 1309.99 insists that "Whoever violates any provision in this building code shall be guilty of a misdemeanor of the first degree, and shall be fined not more than one thousand dollars or imprisoned…"  Id.

Such a violation upon refusal is inevitable:  first, tenants must vacate a home that has not been inspected.  See Section 1311.31 on Doc. 21, PageID 202.  Second, the mandate to yield to inspections of

---

[3]     There is no demand (or need) for a jury trial in this case and the Court has called upon the parties to resolve the case through these cross-motions for summary judgment.  Doc. 36, PageID 369; Doc. 43. Accordingly, the time to supply the Court with specific evidence has now passed without the Defendants having done so.  "[D]istrict courts are widely acknowledged to possess the power to enter summary judgments . . . so long as the losing party was on notice that she had to come forward with all of her evidence." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–26, 106 S. Ct. 2548, 2553–54 (1986).

private homes or face the consequences applies to "all persons" in Bedford, including tenants:  Section 1311.06(d) proclaims that "<u>any person</u> . . . violating <u>any provision</u> of this code . . . or who fails to comply with any written notice or written order . . . <u>or who refuses to permit entry</u> . . . <u>or obstructs or hinders such building official while attempting to make an inspection</u> . . . <u>shall be guilty of a misdemeanor of the first degree</u>."  Doc. 1-3, PageID 25.  Next, Section 1311.01 assures that violations include improper "use and occupancy," while Section 1311.06 reiterates that "it shall be unlawful for any person . . . to . . . use [or] occupy . . . contrary to or in violation of any provision of this code."  Doc. 1-3, PageID 24, 25.  Finally, applicable to tenants and owners alike, Section 1311.05 provides that "the building official . . . may enter at reasonable times any building, structure, or premises in the jurisdiction to perform any duty…"  Doc. 1-3, PageID 25.  Thus, even the City's hypothetical tenant "consent" would be involuntary.

### iii.  Even if a tenant were shown to have voluntarily consented to a rental inspection, such evidence would fail to negate the facial invalidity of the City's original ordinance.

The Supreme Court has specifically rejected any notion that instances of consent save the facial constitutionality of warrantless search authorizations that do not provide any opportunity for pre-compliance review:

> [W]hen assessing whether a statute meets this standard [of unconstitutional in all of its applications], *the Court has considered only applications of the statute in which it actually authorizes or prohibits conduct*. . . Similarly, when addressing a facial challenge to a statute authorizing warrantless searches, <u>the proper focus of the constitutional inquiry is searches that the law actually authorizes, not those for which it is irrelevant. If exigency or a warrant justifies an officer's search, the subject of the search must permit it to proceed irrespective of whether it is authorized by statute. Statutes authorizing warrantless searches also do no work where the subject of a search has consented.</u> Accordingly, the constitutional "applications" that petitioner claims prevent facial relief here are irrelevant to our analysis because they do not involve actual applications of the statute

*City of Los Angeles, Calif. v. Patel*, 135 S. Ct. 2443, 2451-53 (2015)(Emphasis added).  See also *Hardrick v. City of Detroit*, No. 15-13884, 2016 WL 692528, at 1-6 (E.D. Mich. Feb. 22, 2016).  Consequently, Plaintiffs are entitled to summary judgment on their claim that the City of Bedford's original rental inspection mandates violate the Fourth, Fifth, and Fourteenth Amendments on their face.

**C. Plaintiffs' are entitled to restitution commensurate with inspection fees paid to the City.**

Citing the following contentions, the City claims that Plaintiffs are not entitled to restitution: (1) "Bedford ultimately pays much more for these inspections than it collects from the owners of the properties inspected," so "it is not equitable for Bedford to make restitution;" (2) "Bedford divested the Plaintiffs' fees to the salaries of its employees who conducted and administered the inspections," and "without these inspections. . . Bedford would have retained the funds it paid in excess of the Plaintiffs fees to its building inspectors and administrative staff….;" (3) "Bedford does not retain a benefit," and "holds no benefit" because it spent Plaintiffs' funds "and it would be unconscionable now, since Bedford holds no benefit, for this Court to find that the equities demand restitution to Plaintiffs." Doc. 46, PageID 495-496. Each of these claims is misguided.

The purpose of restitution "is to compensate [the plaintiff] for the benefit he has conferred on the defendant." *Johnson v. Microsoft Corp.,* 2005-Ohio-4985, ¶¶ 19-21, 106 Ohio St. 3d 278, 286. Restitution is available when a plaintiff cannot "'assert title or right to possession of particular property, but in which nevertheless he might be able to show just grounds for recovering money to pay for some benefit the defendant had received from him.'" *Great–West Life & Annuity Ins. Co. v. Knudson,* 534 U.S. 204, 213, 122 S.Ct. 708 (2002). To prevail on a claim for unjust enrichment, a plaintiff must prove by a preponderance of the evidence that: (1) the plaintiff conferred a benefit upon the defendant, (2) the defendant had knowledge of such benefit, and (3) the defendant retained that benefit under circumstances in which it would be unjust for him to retain that benefit. *Johnson,* supra, at ¶ 21.

*i.* *Plaintiffs conferred a benefit upon the City.*

The fact that "Bedford ultimately pays much more for these inspections than it collects from the owners of the properties inspected" is irrelevant this Court's consideration of whether restitution is owed because Plaintiffs nevertheless involuntarily "conferred a benefit" upon the City. On this front, arguments similar to those submitted by the City here have been rejected in Ohio restitution cases. In *San*

12

*Allen*, the state defendant similarly argued that wrongful charges imposed on the plaintiffs there were offset by money spent regulating those same plaintiffs:

> The BWC first argues that there was no evidence that the BWC benefitted at the expense of class members. The BWC contends that the plaintiff class could not have conferred any benefit on the BWC because: . . . "the premiums received from the class were used to pay administrative costs and deposited into the state insurance to pay the costs of injuries incurred by Ohio workers," and "the BWC paid more in claims costs related to class members' employees than class members paid the BWC in premiums during the class period."

*San Allen, Inc. v. Buehrer*, 2014-Ohio-2071, ¶ 116.  The Court wisely rejected this argument, reasoning as follows:

> "As discussed above, plaintiffs established that nongroup-rated employers paid excessive premium costs to the BWC for their workers' compensation coverage. If nongroup-rated employers had not paid these premiums, the BWC would have experienced a shortfall in the total premiums collected due to the large discounts it gave group-rated employers under its group rating plan. There would have then been insufficient funds in the state insurance fund to cover all of the costs of claims and expenses and to retain a reasonable surplus. *Accordingly, the BWC clearly benefitted from the excessive premiums paid by the nongroup-rated employers in the plaintiff class. Even assuming that certain class members (or class members in the aggregate) may have paid the BWC less in premiums than the BWC incurred in claims costs related to those class members does not mean that a benefit was not conferred by nongroup-rated employers on the BWC."*

*San Allen, Inc. v. Buehrer,* 2014-Ohio-2071, ¶ 117-118 (Emphasis added).  Similarly here, just because the City of Bedford may have spend more on its warrantless inspections mandates than the aggregate value of the inspections fees collected from the Plaintiffs' class does not mean that the Plaintiffs failed to confer a benefit on the City.  Just as in *San Allen,* the City benefited from imposing surcharges for unlawful mandatory inspections on plaintiffs insofar as it was able to offset what it characterizes as a general public health and safety program on the backs of the Plaintiffs' class.  Without the funds extracted from Plaintiffs, the City may have been required to impose a general tax increase to fund the warrantless searches, or otherwise, entirely unable to impose the mandates.  Consequently, there is no doubt that Plaintiffs conferred a benefit.

### ii.  It would be unjust for the City to retain the benefit Plaintiffs conferred upon it.

The fact that "Bedford ultimately pays much more for these inspections than it collects from the owners of the properties inspected" is irrelevant this Court's consideration of whether restitution is owed

13

because the central issue is whether the charge imposed was unconstitutional or otherwise unlawful, such that there was no authority to take Plaintiffs funds in the first place.

When a governmental actor imposes an unlawful fee, tax, assessment, or other monetary charge pursuant to fulfill an unconstitutional practice or pursuant to an unconstitutional statute, that governmental actor's retention of those funds is "unjust." *State ex rel. Zone Cab Corp. v. Indus. Comm.,* 132 Ohio St. 437, 8 N.E.2d 438 (1937), and *Arth Brass & Aluminum Castings, Inc. v. Conrad,* 104 Ohio St.3d 547, 2004-Ohio-6888 (BWC was unjustly enriched because it "collected premiums in violation of [an] Ohio statute.")

In *State ex rel. Zone Cab Corp., supra,* the Ohio Supreme Court determined that employers were entitled to a refund of workers' compensation premium "overpayments" paid on behalf of workers who were later determined to be independent contractors rather than employees.  *State ex rel. Zone Cab Corp.,* 132 Ohio St. at 444.  As the court explained in ordering a refund of the premiums that had been overpaid, "the rationale of this concept is that the excess payments never did in reality belong in the State Insurance Fund and could be required in the first instance only for the purpose of meeting a possible adjudication requiring payment of compensation on the claims. The adjudication having been otherwise the excess is no longer properly a part of the fund and should be restored to the rightful owner.  The relator is entitled to a refund covering excessive payments under merit rating, and a writ of mandamus will be awarded commanding the refund…"  *Id.* at 443–444.

In *Arth Brass*, "the court further held that the BWC "should be liable to credit [the employer] * * * to the extent that the premiums [the BWC] received exceeded those [the employer] would have made had the medical benefits not been charged to its risk account." *Arth Brass,* 104 Ohio St.3d 547, 2004-Ohio-6888, at ¶ 50–¶ 53; *see also Santos,* 101 Ohio St.3d 74, 2004-Ohio-28, at ¶3–8, 17 (where injured workers brought a restitution claim to recover funds the BWC had wrongfully collected pursuant to a subrogation statute that was later declared unconstitutional, "[t]he action seeking restitution by Santos and his fellow class members [was] an action to correct the unjust enrichment of the BWC"); *Judy*

*v. Ohio Bur. of Motor Vehicles,* 100 Ohio St.3d 122, 2003-Ohio-5277 (affirming decision requiring the BMV to refund excess license reinstatement fees collected as a result of an erroneous interpretation of R.C. 4591.191(L)); *State ex rel. Minutemen,* 62 Ohio St.3d 158 (1991) (unlawful premium overcharges resulting from the BWC's implementation of new manual classifications developed for administrative convenience must be reimbursed).

In the Section 1983 context, in *Jordan v. City of Bucyrus, Ohio,* the plaintiffs brought a "civil rights action challenging the constitutionality of the defendant City's collection of union agency fees from them," claiming they were "entitled to <u>full</u> refund of all agency or service fees withheld." *Jordan v. City of Bucyrus, Ohio,* 739 F.Supp. 1124, 1127-1128 (N.D. Ohio 1990). The Court responded with a "grant of restitution" for unconstitutional seizures of the plaintiffs' funds. *Id.*

Indeed, "rights passing through the Section 1983 prism may in proper cases be vindicated by . . . orders of restitution." *City of Monterey v. Del Monte Dunes at Monterey, Ltd.,* 526 U.S. 687, at 751-52 (1999). Accordingly, in Section 1983 litigation similar to this case, federal courts have ordered restitution. After certifying a class of such plaintiffs, the Court in *Samuel v. Univ. of Pittsburgh* held that "restitution is due any woman who paid the higher out-of-state tuition rate solely by reason of the application of the unconstitutional residency rules," as "the Universities were unjustly enriched in that they wrongfully secured a benefit which it would be unconscionable for them to retain," because they "obtained the excess fees from the class under the pretext that the exaction was legal." 538 F.2d 991, 994, 995 (3d Cir. 1976). And in *Allen v. Leis,* Judge Spiegel, in Section 1983 facial challenge, certified a class of all plaintiffs who were seeking "restitution of all funds illegally taken" by way of unconstitutional "$30.00 book-in-fees." 204 F.R.D. 401 (S.D. Ohio 2001).[4]

While not strictly binding on this Court, several court decisions mandating restitution as to all inspection fees paid pursuant to an invalid inspection mandate is persuasive authority due to its material

---

[4]      This case is highly instructional for this Court's consideration of whether to certify Plaintiffs' proposed class.

similarity to this case.  In *Cinnaminson Motel Owners Ass'n v. Twp. of Cinnaminson,* the Court ordered a

full refund of inspection fees paid by motel owners under a theory of restitution, explaining as follows:

> In the present case the fees were not merely excessive, they were entirely improper. It therefore appears that the full amount of the improper charges must be refunded. Cinnaminson argues, however, that the members of the association paid the inspection fees without protest until this suit was instituted and are therefore volunteers not entitled to a refund of any monies paid prior to the institution of the suit. That may be the law of New Jersey in the case of true volunteers but the motel owners involved here cannot be so described . . . The motel owners would not have been permitted to operate their businesses if they had not paid the inspection fees. Furthermore, they were subject to the provisions of a penal ordinance providing for the imposition of fines and imprisonment for its violation . . . It cannot be said that they paid the inspection fees "voluntarily."

*Cinnaminson Motel Owners Ass'n v. Twp. of Cinnaminson*, 231 N.J. Super. 163, 171–73, 554 A.2d 1372,

1376–77 (Law. Div. 1987).  In mandating refund of the inspection fees, the Court relied upon an earlier

state supreme court decision reasoning as follows:

> [A] refund should be distributed to all dentists who paid registration fees under the invalidated fee schedule.  Basic principles of honesty and equity mandate this result. Furthermore, there is no basis in law for the Board to retain the disputed funds . . . <u>In our view, the Association's entitlement to a refund of excess fees followed naturally from the determination that these fees were illegally exacted.</u>  To hold otherwise would allow the Board to enrich itself unjustly at the expense of the members of the Association. It would violate one of the cardinal principles of the common law, requiring restitution to prevent unjust enrichment . . . [W]hen a tax already collected is set aside by judicial decision, "the law raises an assumption to refund the money which can no longer be honestly retained." The taxing entity has "not a particle of right to the money in question," which is due to the taxpayer "according to the principles of common honesty.

> *In the Matter of an Increase in Fees by the New Jersey State Bd. of Dentistry,* 84 N.J. 582, 587,

423 A.2d 640 (1980)(emphasis added), citing Restatement of Restitution s 1 (1937).  Ultimately, failure

to make restitution for unconstitutional exactions, in and of itself, likely violates Due Process principles:

a set of plaintiffs in state court were recently held "entitled to recover from defendant [Cuyahoga County]

the full amount of [unconstitutional] sewer tap-in/connection fees paid by the plaintiffs to the [County]"

because to hold otherwise would result in "an unlawful taking of property in violation of their

constitutional rights."  *Engelman v. Budish,* 2015-Ohio-1153, ¶ 11-13.

Here, the City has, under the pretense of lawful conduct, collected money to which it is not

entitled.  That the fees solely funded *unlawful* inspections is indisputable as a matter of both law and

16

evidence:  in response to Plaintiffs' Interrogatories requesting identification of all accounts to which point of sale inspection fees and rental inspection fees were allocated, the City responded "The City of Bedford pays inspectors to conduct rental inspections" and "The City pays inspectors to conduct point of sale inspections."   Doc. 45-1, PageID 421, 426 (Response to Interrogatory No. 5 of Kenneth Pund and Response to Interrogatory 5 of John Diezic).   Thus, the City has collected money to which it is not entitled.  Accordingly, equity warrants the return of ill-gotten gains in the form of inspection fees derived to fund unconstitutional inspections.

Meanwhile, despite submitting evidence regarding the *costs* to the City, the City fails to provide evidence that it was providing a meaningful service or benefit to the Plaintiffs' class, even as Plaintiff Kenneth Pund's Declaration explains the lack of value of such inspections to homeowners.  Indeed, one can fathom many unconstitutional programs where local government spends public funds but fails to confer a benefit on the party upon whom the funds are spent.

### iii.  It is no defense that the City claims to have spent Plaintiffs' funds.

The City's claim that is free to avoid restitution because it "divested," i.e. spent the inspection fees it collected from Plaintiffs is irrelevant to inquiry of whether restitution is owed to the Plaintiffs.

*First,* the inquiry on this front is solely one of whether the City has *retained a benefit* at Plaintiffs' expense, not whether the exact funds collected from Plaintiffs continue to be located in a special lock-box.  One manner of retaining a benefit at the expense of another is to use the extracted funds for a chosen purpose, rather than saving the funds or raising more funds to underwrite that same chosen purpose.  And as a matter of logic, any argument otherwise must fail:  because government always spends funds that it takes from the public, no restitution claim against any governmental actor would ever be viable under Defendants' theory.  Yet the precedent above robustly demonstrates that such claims are indeed viable, including in many cases where the governmental actor has already spent the plaintiffs' funds on programs

for which those funds were earmarked.[5]  Simply put, due to the unlawful taking of Plaintiffs' funds, the City retains the benefit of having forced the inspections.

*Second,* Ohio courts have addressed arguments akin to that made by the City here.  In *San Allen, Inc. v. Buehrer,* the Court found it irrelevant that "the BWC distributed the funds after the excessive premiums were allegedly wrongfully collected from the class—such that the specific funds constituting plaintiffs' overpayments may no longer be readily traceable."  2014-Ohio-2071, ¶¶ 60-61.  The Court instead focused on the reality that "plaintiffs seek the return of the specific premiums they claim were unlawfully collected by the BWC."  *Id.*  Likewise, in *Dunlop v. Ohio Dep't of Job & Family Servs.,* the Court, applying Ohio Supreme Court precedent, explained "we fail to see how appellant's distinction that ODJFS distributed rather than retained most of the allegedly ill-gotten monies," and "[t]hus, the funds can either be wrongfully collected or wrongfully held by the state to form the basis of an action brought in equity."  2012-Ohio-1378, ¶¶ 13-14.

Thus, because Plaintiffs here seek the return of the specific inspection fees that were unlawfully collected by the City to defray the expensive of its chosen program, Plaintiffs are entitled to restitution irrespective of whether such fees remain earmarked in a designated account.  Accordingly, there is no genuine issue as to any fact material to Plaintiffs' restitution claim, and Plaintiffs are entitled summary judgment on the issue of whether they are entitled restitution.

**D. Defendants' marginal objections do not negate Plaintiffs' entitlement to restitution.**

Defendants appear to acknowledge that their arguments for mootness and warrantless forced home searches and against restitution for extractions funding the offending searches maintain limited prospects for success.  Accordingly, the City turns to *the amount* of restitution owed, suggesting that there "is a genuine issue of material fact as to the amount" because "Bedford was entitled to conduct naked-eye

---

[5]     It is noteworthy that the City allocated all inspection fees to "the general fund."  See Doc. 45-1, PageID 421.  Thus, the City is unable to accurately pinpoint exactly what happened to Plaintiffs' exact funds. Further, all monies in a City's general fund are fungible, and so long as the current account balance in that funds exceeds the amount collected from Plaintiffs, it is fair to say that the City continues to retain those funds, or at minimum, cannot prove that it does not.

18

inspections of the exterior of the properties, and it should not be required to pay restitution of the full fee Plaintiffs paid for the point-of-sale inspections." Doc. 46, PageID 498. In other words, "the inspection of the exterior of the properties was constitutional, and any fee collected in connection to the exterior of the inspections do not unjustly enrich Bedford." *Id.*

The City's inspection checklists, before this Court as evidence, confirm that the vast majority of the City's exterior search occurs within constitutionally-protected curtilage. However, Plaintiffs acknowledge that the determination of whether any particular exterior location is protected curtilage is a fact-intensive inquiry. See *United States v. Dunn*, 480 U.S. 294, 300–01, 107 S. Ct. 1134, 1139–40 (1987)("Drawing upon the Court's own cases and the cumulative experience of the lower courts that have grappled with the task of defining the extent of a home's curtilage, we believe that curtilage questions should be resolved with particular reference to four factors: the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by"). Plaintiffs recognize that such an amorphous inquiry is impractical if not entirely incapable of meaningful resolution given the many home searches at issue here and the inadequacy of the City's records.

Accordingly, to resolve these matters and ostensibly this case, Plaintiffs stipulate to (1) the treatment of all <u>exterior</u> portions of rental and point of sale inspections conducted under the original policies as constitutionally permissible; and (2) the Defendants' evidentiary claim that "Bedford building inspectors spend on average one-third of the inspection time doing a naked-eye inspection of the property." Doc 46, PageID 497.

Consequently, Plaintiffs stipulate that restitution owed to the Plaintiffs' classes may be reduced by one-third on a *pro rata* basis such that (1) the amount of restitution owed to the members of Subclass A is reduced from $23,575 to $15,717; (2) the amount of restitution owed to the members of Subclass B is reduced from $38,125 to $25,417; (3) the total amount of restitution owed to the two classes combined is

reduced from $61,700 to $41,134; and (4) those who would have otherwise received a refund of their $50 inspection fee will instead receive a refund of $33.33.

Further, Plaintiffs acknowledge that Defendants provided them with voluminous inspection records that were disorganized and occasionally incomplete.  Accordingly, to advance resolution of this case, Plaintiffs stipulate to the accuracy the City's claim that Plaintiffs identified "12 instances where Bedford did not collect a fee, or there was a duplication of inspections or fees noted by the Plaintiffs." Doc. 46, PageID 498.  This further reduces Plaintiffs total claim for restitution by $400 (12 x $33.33), i.e. from $41,134 to $40,734.

Given Plaintiffs' stipulations to the City's evidence regarding restitution, no evidentiary disputes remain on this front:  there are no genuine issues as to any material facts regarding the amount of restitution owed.  Consequently, Plaintiffs are entitled to summary judgment on their claim for $40,734 in restitution.

### E.  Conclusion

No genuine issues of material fact exist on these issues and Plaintiffs are entitled to judgment as a matter of law on their claims that (1) the City of Bedford's original and longstanding mandatory warrantless point of sale and rental searches unduly infringed upon Plaintiffs' Fourth, Fifth, and Fourteenth Amendment rights; and (2) Plaintiffs' two certified subclasses are entitled to $40,734 in restitution for inspection fees extracted to fund the unconstitutional inspections.

Respectfully submitted,

*/s/ Maurice A. Thompson*
Maurice A. Thompson (0078548)
1851 Center for Constitutional Law
122 E. Main Street
Columbus, Ohio 43215
Tel: (614) 340-9817
*MThompson@OhioConstitution.org*

20

Sheldon Berns (0000140)
Berns, Ockner & Greenberger, LLC
3733 Park East Drive, Suite 200
Beachwood, Ohio 44122
Tel: (216) 831-8838, Ext. 205
Fax: (216) 464-4489
*SBerns@BernsOckner.com*

Christopher Finney (0038998)
Finney Law Firm, LLC
4270 Ivy Pointe Boulevard, Suite 225
Cincinnati, Ohio  45245
(513) 943-6660 phone
*Chris @Finneylawfirm.com*

### <u>Local Rule 7.1(f) Certification</u>

As a certified class action lawsuit adjudicating fundamental constitutional rights, this case qualifies as "complex" and is therefore subject to the page limitation governing "complex" cases.   Counsel certifies that this Motion and Memorandum is within that page limitation.

Respectfully submitted,

/s/   Maurice A. Thompson
Maurice A. Thompson (0078548)

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing Motion for Partial Summary Judgment has been served on Defendants, through the Court's filing system email on November 16, 2017

Respectfully submitted,

/s/   Maurice A. Thompson
Maurice A. Thompson (0078548)