PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

KENNETH PUND, *et al.*,                       )
                                              )       CASE NO.  1:16CV1076
               Plaintiffs,                    )
                                              )
        v.                                    )       JUDGE BENITA Y. PEARSON
                                              )
CITY OF BEDFORD, OHIO, *et al.*               )
                                              )       **MEMORANDUM OF OPINION AND**
               Defendants.                    )       **ORDER** [Regarding ECF No. 27]
                                                      [Resolving ECF No. 45]


        Pending before the Court is Plaintiffs' Motion for Partial Summary Judgment on the First,

Second, Fourth, Ninth, and Thirteenth Prayers for Relief in their First Amended Complaint.  ECF

No. 45.  Defendants responded in opposition.  ECF No. 46.  Plaintiffs filed a reply.  ECF No. 47.

For the reasons that follow, the motion is granted in part and denied in part.  Additionally, the

Court certifies Plaintiffs' proposed class under Fed. R. Civ. Pro. 23(b)(3) and directs Class

Counsel to promptly file a Proposed Notice of Pendency of Class Action under Rule 23(b)(3).

## I. Background

        Plaintiffs, citizens of the City of Bedford, Ohio, filed this lawsuit against Defendants City

of Bedford, Ohio ("City" or "Bedford"), Rob Brown, and Richard Hickman, pursuant to 42

U.S.C. § 1983, for Bedford's allegedly unconstitutional enforcement of the Point of Sale and

Rental Inspection Ordinances.  ECF No. 21.  Bedford's Point of Sale Inspection Ordinance

required homeowners to obtain a Certificate of Inspection ("Certificate") before selling their

(1:16CV1076)

homes.  *Id.* at PageID#: 180.  A Certificate, valid for twelve months, was issued after a building

official inspected "all structures or premises used for dwelling purposes and all secondary or

accessory structures to determine whether such structures or premises conform[ed] to the

provisions of th[e] code."  ECF No. 1-3 at PageID#: 25.  On inspection, the building official

could enter the property at any reasonable time and inspect areas including basements,

bathrooms, staircases, doors, windows, electrical equipment, roofing, siding, concrete walk and

driveways, among others.  ECF No. 21 at PageID#: 181.  Obtaining the Certificate required

homeowners to apply for and consent to a warrantless inspection of the home and to pay of an

inspection fee ranging from $50 to $200.  ECF No. 45 at PageID#: 398.  If the home did not pass

inspection, the homeowner was required to perform repairs or, if sold before repairs were

complete, the new owner would deposit money in escrow to pay for repairs.  ECF No. 1-3 at

PageID#: 26.  Homeowners that violated the ordinance or refused an inspection were guilty of a

misdemeanor and could be fined and imprisoned.  ECF No. 21 at PageID#: 182.

Similarly, Bedford's Rental Inspection Ordinance required landlords to schedule a

warrantless inspection of their rental units every two years or each time a new tenant arrived.

ECF No. 21 at PageID#: 202.  A landlord was to obtain a Certificate in order to lease his property

to a tenant.  *Id.*  Landlords paid an inspection fee ranging from $20 to $50 per unit, and failure to

comply could result in criminal penalties including fines and imprisonment.  *Id.*

After filing its initial complaint, Plaintiffs moved the Court to enter a Temporary

Restraining Order and a Preliminary Injunction.  ECF No. 4.  Prior to the hearing, the Court

granted the parties' Joint Motion for an Order Granting Preliminary Injunction as to the Fifth and

Sixth Prayers for Relief enumerated in Plaintiffs' May 4, 2016 Verified Complaint.  ECF No. 11

(1:16CV1076)

at PageID#: 74.   That Order temporarily enjoined Defendants from enforcing the warrantless

searches and from criminally prosecuting Plaintiffs based on the City's Point of Sale Ordinance.

_Id_.  The Court also ordered that Plaintiffs' Motion for Preliminary Injunction (ECF No. 4) be

converted to and treated as a Motion for Permanent Injunction.  ECF No. 11 at PageID#: 77.

The City subsequently amended its Point of Sale Inspection Ordinance by including an

administrative warrant process for home inspections and removing any criminal penalties for

failure to consent to an inspection.  ECF No. 17-1.  The Court therefore denied Plaintiffs' request

for injunctive relief (ECF No. 4) as moot.  ECF No. 20.

On January 30, 2017, Plaintiffs filed an Amended Complaint, which included claims for

class-wide relief with respect to the Rental Inspection Ordinance.  ECF No. 21.  Plaintiffs

contend that the warrantless search policy under the Rental Inspection Ordinance was essentially

identical to the warrantless search policy under the already-enjoined Point of Sale Inspection

Ordinance.  _Id._ at PageID#: 191, ¶ 114.  Following a hearing on Plaintiffs' Motion for Temporary

Restraining Order, held on February 14, 2017, Defendants agreed to amend the Rental Inspection

Ordinance and not to enforce it in the meantime.  February 14, 2017, _Minutes of Proceedings_.

On March 10, 2017, Defendants certified that the City had amended its ordinance to include an

administrative warrant provision and eliminate criminal penalties, and they submitted a copy of

the amended ordinance to the Court.  _See_ ECF Nos. 31; 31-1.  The Court later denied Plaintiffs'

modified Oral Motion for Temporary Restraining Order as moot.  ECF No. 35.

(1:16CV1076)

On February 17, 2017, Plaintiffs filed a Motion for Class Certification. ECF No. 27. The Court granted Plaintiffs' motion and certified the following two classes under Rule 23(b)(1)(A)[1] and (b)(2)[2]:

> **Subclass A:** All individuals and businesses that have (1) been subjected to Point of Sale Inspections between September 10, 2014 and January 30, 2017; and (2) paid Point of Sale Inspection fees to the City of Bedford in conjunction with the aforesaid inspection(s).

> **Subclass B:** All individuals and businesses that have (1) been subjected to rental inspections between September 10, 2014 and February 14, 2017; and (2) paid Rental Inspection fees to the City of Bedford in conjunction with the aforesaid inspection(s).

ECF No. 35 at PageID#: 367.

Now, pending before the Court is Plaintiffs' Partial Motion for Summary Judgment on the First, Second, Fourth, Ninth, and Thirteenth Prayers for Relief in the First Amended Complaint. ECF No. 45. Those Prayers for Relief ask the Court to do the following:

> (1) Declare that the City of Bedford's Point of Sale Inspection Requirements and Rental Inspection Requirements, as they existed on May 4, 2016, authorizing warrantless searches without probable cause, are unconstitutional, both facially and as applied to Plaintiffs;

> (2) Declare that provisions of the original Point of Sale Inspection Requirements and current Rental Inspection Requirements wholly reliant upon the unconstitutional search, including but not limited to the monetary extraction for inspections and the permit requirement, violated Plaintiffs' Fourth Amendment rights;

---

[1] "A class action may be maintained if . . . prosecuting separate actions by or against individual class members would create a risk of . . . inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for the party opposing the class . . . ." Fed. R. Civ. Pro. 23(b)(1)(A).

[2] "A class action may be maintained if . . . the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole . . . ." Fed. R. Civ. Pro. 23(b)(2).

(1:16CV1076)

(4) Declare that through the imposition of monetary assessments on Plaintiffs and others, precipitated by the City's desire to fund the costs of the Point of Sale Inspection Requirements and Rental Inspection Requirements, Defendant City of Bedford has been and continues to be unjustly enriched;

(9) Mandate the return of Point of Sale Inspection and Rental Inspection fees paid by Plaintiffs and others to Defendant City of Bedford; [and]

(13) Reimburse Plaintiffs for amounts they have paid to the City of Bedford in inspection fees related to unconstitutional inspections. . . .

ECF No. 21 at PageID#: 199-200; ECF No. 45 at PageID#: 391.

## II. Standard of Review

Summary judgment is appropriately granted when the pleadings, the discovery and disclosure materials on file, and any affidavits show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Johnson v. Karnes*, 398 F.3d 868, 873 (6th Cir. 2005). The moving party is not required to file affidavits or other similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies upon the absence of the essential element in the pleadings, depositions, answers to interrogatories, and admissions on file. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The moving party must "show that the non-moving party has failed to establish an essential element of his case upon which he would bear the ultimate burden of proof at trial." *Guarino v. Brookfield Twp. Trustees.*, 980 F.2d 399, 403 (6th Cir. 1992).

Once the movant makes a properly supported motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. An opposing party may not simply rely on its pleadings; rather, it must "produce evidence that results in a conflict of material fact to be resolved by a jury." *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995). To defeat the

(1:16CV1076)

motion, the non-moving party must  "show that there is doubt as to [whether] the material facts and that the record, taken as a whole, does not lead to a judgment for the movant." *Guarino*, 980 F.2d at 403.  In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party when deciding whether a genuine issue of material fact exists.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587-88 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144 (1970).

"The mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment . . . ." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)).  The fact under dispute must be "material," and the dispute itself must be "genuine."  A fact is "material" only if its resolution will affect the outcome of the lawsuit.  *Scott*, 550 U.S. at 380.  In determining whether a factual issue is "genuine," the Court assesses whether the evidence is such that a reasonable jury could find that the non-moving party is entitled to a verdict.  *Id.* ("[Summary judgment] will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

### III. Analysis

#### A. Mootness

As a preliminary matter, the Court addresses the question whether Plaintiffs' claims are moot.  Defendants argue that Plaintiffs' claims are moot because Bedford has amended its Point of Sale and Rental Inspection Ordinances and therefore, the constitutionality of the amended ordinances is no longer at issue.  ECF No. 46 at PageID#: 486.

(1:16CV1076)

"[W]hen the issues presented are no longer 'live' or the parties lack a legally cognizable

interest in the outcome," a case becomes moot.  *Gottfried v. Med. Planning Servs.*, 280 F.3d 684,

691 (6th Cir. 2002) (citing *Cty. of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979)).  When

establishing whether a claim is moot, the facts of a specific case "often require a highly

individualistic, and usually intuitive" examination.  *Gottfried*, 280 F.3d at 691 (citing *McPherson

v. Mich. High Sch. Ath. Ass'n*, 119 F.3d 453, 458 (6th Cir. 1997)).

The Court has already ruled that Plaintiffs' injunctive claims are moot, both as to the

Point of Sale Inspection Ordinance and the Rental Inspection Ordinance.  ECF Nos. 20; 35.

Plaintiffs, however, "preserve[] [a] . . . backward-looking right to challenge the original law."

*Midwest Media Prop., LLC v. Symmes Twp.*, 503 F.3d 456, 461 (6th Cir. 2007).  "[W]here a

claim for injunctive relief is moot, relief in the form of damages for a *past* constitutional

violation is not affected."  *Gottfried*, 280 F.3d at 691 (emphasis added).  It is undisputed that

Plaintiffs paid inspection fees in compliance with the City's Ordinances before those Ordinances

were amended.  *See* ECF No. 45 at PageID#: 398; ECF No. 46 at PageID#: 490.

Defendants do not meaningfully deny that Plaintiffs' claims for monetary relief should

survive.  Defendants rely principally on the Sixth Circuit's ruling in *Brandywine, Inc. v. City of

Richmond*, 359 F.3d 830 (6th Cir. 2004) to argue that Plaintiffs claims are not live.  *See* ECF No.

46 at PageID#: 486-88.  They acknowledge, however, that in *Brandywine*, the plaintiffs' claim

for money damages survived a mootness challenge (though the claim was dismissed on other

grounds).  *Id.* at PageID#: 487; *Brandywine*, 359 F.3d at 836.

Rather, the heart of Defendants' contention is that Plaintiffs' claims for *declaratory* relief

are moot.  ECF No. 46 at PageID#: 486. Defendants' argument is misplaced.  The court in

(1:16CV1076)

*Brandywine* dismissed the declaratory claims as moot because the whole purpose of the

declaratory relief was to achieve corresponding injunctive relief, which was moot. *Brandywine,*

*359 F.3d at 836*. Had the requested declaration corresponded with some other live, valid prayer

for relief, the court would have upheld it as live. "[A] declaratory judgment is *normally* a

prelude to a request for other relief, whether injunctive or monetary." *Berger v. Xerox Corp.*

*Retirement Income Guarantee Plan*, 338 F.3d 755, 763 (7th Cir. 2003). "So there is nothing

suspicious about the characterization of the suit as one for declaratory relief," *id.* even though

Plaintiffs' ultimate goal is to obtain a monetary award, which Defendants all but concede is still

live. ECF No. 46 at PageID#: 487-88.

Such is especially the case in a class action, because it is rarely certain that a certified

class will remain together for the duration of the litigation. "A class action, of course, is one of

the recognized exceptions to the rule against claim-splitting." *Gooch v. Life Inv'rs Ins. Co. of*

*Am.*, 672 F.3d 402, 428 n.16 (6th Cir. 2012) (citations omitted). Plaintiffs in this case are not

seeking an "empty declaration," *Berger*, 338 F.3d at 764. Declaratory relief is part and parcel of

their claim for monetary relief, which is live.

Despite the amendments to the Point of Sale and Rental Inspection Ordinances, Plaintiffs'

claims for declaratory and monetary relief are still viable and not moot.

**B. Declaratory Relief (Prayers One, Two, and Four)**

In Prayers for Relief 1 and 2, Plaintiffs ask the Court to declare that Bedford's Point of

Sale Inspection Ordinance and Rental Inspection Ordinance, as they existed on May 4, 2016,

were unconstitutional on their face and as applied to Plaintiffs. ECF No. 45. In Prayer for Relief

4, they ask the Court to declare that the City has been unjustly enriched by its allegedly

(1:16CV1076)

unconstitutional collection of inspection fees.  *Id.*  For the reasons that follow, summary

judgment on Prayer 1 is granted, summary judgment on Prayer 2 is granted to the extent it is

redundant with Prayer 1, and summary judgment on Prayer 4 is granted.

Plaintiffs argue that Bedford's searches were warrantless and coercive, rendering consent

to inspection impossible.  ECF No. 45 at PageID#: 399. Thus, they argue, the warrantless

inspections violated their Fourth Amendment right to be free from unreasonable searches.  *Id.*

Traditionally, courts examine an ordinance's constitutionality as applied to the plaintiffs

prior to analyzing a facial challenge, which determines whether a statute is unconstitutional in all

its conceivable applications.[3] *Ohio Citizen Action v. City of Englewood*, 671 F.3d 564, 570 (6th

Cir. 2012).  In this case, both constitutional challenges (that is, facial and as applied) can be

analyzed as one.  Both claims hinge on the same question: Under the Ordinances, could

voluntary consent could have been given by *any* homeowner, given that the only alternative to

"consent" was criminal penalty?  *See Thompson*, 307 F. Supp. 3d at 774.  If, as Plaintiffs argue,

class members had a Fourth-Amendment right to withhold consent to warrantless inspection, and

the threat of criminal penalty made it impossible to voluntarily consent to inspection as a matter

of law, then the Point of Sale Inspection Ordinance and the Rental Inspection Ordinance were

---

[3] The Court notes, however, that for the purposes of this litigation, this may be a distinction without a difference.  The City has already amended the Point of Sale Inspection Ordinance, ECF No. 17-1, and the Rental Inspection Ordinance, ECF No. 31-1, to correct the portions that may offend the Fourth Amendment.  Under these circumstances, a declaration of facial unconstitutionality accomplishes little more than a declaration of unconstitutionality as applied to Plaintiff class members.  The Court nevertheless entertains the facial arguments as to both Ordinances in order to preclude argument, if appropriate, about whether any given individual class member should be denied relief going forward in the litigation.

(1:16CV1076)

unconstitutional as to *all* Bedford property owners whose property was inspected under the Ordinances without a warrant.

The Fourth Amendment protects people in the privacy of their homes and "against unreasonable searches and seizures." *Camara v. Mun. Court of San Francisco*, 387 U.S. 523, 528 (1967). The "basic purpose" of the Fourth Amendment "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Id.* The Supreme Court held that the "chief evil" guarded against by the Fourth Amendment is a "physical entry of the home." *Payton v. New York*, 445 U.S. 573, 585 (1980) (quoting *United States v. United States Dist. Court*, 407 U.S. 297, 313 (1972)). For government to search one's home, the Fourth Amendment demands either a warrant or voluntary consent, except in narrowly defined circumstances not present in this case. *Camara*, 387 U.S. at 528.

### 1. Point of Sale Inspection Ordinance As It Existed on May 4, 2016

Plaintiffs' First and Second Prayers for Relief ask the Court to declare that Bedford's Point of Sale Inspection Ordinance, as it existed on May 4, 2016, was unconstitutional. ECF No. 45 at PageID#: 391. The Court finds that there is no genuine dispute of material fact and rules that Plaintiffs in Subclass A (the Point of Sale Inspection Plaintiffs) are entitled to judgment as a matter of law on these prayers for relief.

All agree that, under the Ordinance, City inspectors entered the class members' homes without a warrant and that homeowners were obligated to comply under threat of criminal penalty. ECF No. 45 at PageID#: 394-95; *see* ECF No. 46 at PageID#: 485. Plaintiffs argue that voluntary consent to inspection, necessary for the City's compliance with the Fourth Amendment, was impossible for any homeowner to give under the terms of the Ordinance

(1:16CV1076)

because the only alternative to "consent" was criminal penalty.  ECF No. 45 at PageID#: 401-04.

Defendants do not take up this argument; they instead rely on their argument that the declaratory

relief sought in Prayers 1 and 2 is moot.  ECF No. 46 at PageID#: 490-94.  The Court has already

addressed and rejected Defendants' position.

Nevertheless, it is necessary to examine whether Plaintiffs' contention rings true.  Is it the

case that "consent" given under threat of criminal penalty can never be deemed voluntary?  A

homeowner's voluntary consent to a search satisfies the government's Fourth-Amendment

obligations.  *Camara*, 387 U.S. at 539.  Consent that is truly voluntary is given "uncontaminated

by any duress [or] coercion."  *United States v. Tillman*, 963 F.2d 137, 143 (6th Cir. 1992) (citing

*United States v. Williams*, 754 F.2d 672, 674-75 (6th Cir. 1985)).  In determining whether

consent is voluntary, the Court considers the facts under the totality of the circumstances.  *See*

*United States v. Worley*, 193 F.3d 380, 384 (6th Cir. 1999) (holding that the statement of

approval, "You've got the badge, I guess you can," to a police officer prior to the officer's search

did not reflect voluntary consent because the defendant believed there was no other option but to

comply with the officer).

In *City of Los Angeles v. Patel*, the Supreme Court faced a virtually identical question to

the one presented in this case.  135 S. Ct. 2443 (2015).  In that case, under a local ordinance,

without any kind of administrative warrant requirement, a hotel owner could be obligated to turn

over her guest registry to the police.  *Id.* at 2452.  A noncompliant hotel owner could "be arrested

on the spot."  *Id.*  The Court held, under the Fourth Amendment, that "business owners cannot

reasonably be put to this kind of choice."  *Id.* (citing *Camara*, 387 U.S. at 533).  In *Patel*, the

Court ruled that the city's ordinance was facially unconstitutional    that is, no set of

(1:16CV1076)

circumstances existed under which the ordinance could be validly applied.  135 S. Ct. at 2452.

Hotel owners in Los Angeles, facing criminal penalties, simply had no real choice but to comply,

so their compliance could never be deemed "voluntary consent."

      In this case, according to Plaintiffs' uncontested allegations, Bedford's Point of Sale

Inspection Ordinance (as it existed on May 4, 2016) featured no administrative warrant

requirement.  ECF No. 45 at PageID#: 394.  The Ordinance required a homeowner to obtain a

Certificate in order to sell a home, which in turn allowed a building inspector to enter and search

the property without a warrant at any reasonable time after being notified that the property was

for sale.  ECF No. 45 at PageID#: 394; ECF No. 46 at PageID#: 485.  Failure to comply was

punishable as "a misdemeanor of the first degree."  ECF No. 45 at PageID#: 396.  Attendant

penalties included fines between $50 and $500 for the first offense and $100 to $1,000 for the

second.  Id.  A second offense was also punishable by up to six months' imprisonment.  Id.  Each

day that a homeowner refused to comply with the inspection constituted a separate offense, for

which potential punishments multiplied.  Id.

      As in *Patel*, Bedford homeowners had no real choice but to comply with the City's

warrantless inspection under the Point of Sale Ordinance.  Under the terms of the Ordinance,

even two days of noncompliance warranted imprisonment up to six months.  Homeowners

"cannot reasonably be put to this kind of choice."  *Patel*, 135 S. Ct. at 2452.

      Other district courts have reached the same conclusion on similar facts.  *Thompson v. City
of Oakwood, Ohio*, 307 F. Supp. 3d 761 (S.D. Ohio 2018) (homeowners were coerced to submit

to a home inspection because it was required to sell a home and noncompliance would result in

criminal penalty); *Dearmore v. City of Garland*, 400 F. Supp. 2d 834, 904 (N.D. Tex. 2005) (a

(1:16CV1076)

homeowner or landlord must be able to refuse a search without criminal penalties and a warrant procedure must be in place for such circumstances).

Bedford's Point of Sale Ordinance as it existed on May 4, 2016, was unconstitutional on its face and, consequently, as applied to Plaintiffs. The Ordinance permitted warrantless inspections, and it was impossible as a matter of law for homeowners to give voluntary consent to the inspection.

### 2. Rental Inspection Ordinance As It Existed on May 4, 2016

Plaintiffs' First Prayer for Relief also asks the Court to declare that the Rental Inspection Ordinance, as it existed on May 4, 2016, was unconstitutional. ECF No. 45 at PageID#: 391. The Court finds that there is no genuine dispute of material fact and rules that Plaintiffs in Subclass B (the Rental Inspection Plaintiffs) are entitled to judgment as a matter of law on this prayer for relief.

Although Plaintiffs allege that the Rental Inspection Ordinance embodied a virtually identical policy as the Point of Sale Inspection Ordinance, ECF No. 21 at PageID#: 191, ¶ 114, there is at least one important distinction. Under the Point of Sale Inspection Ordinance, the individual who was burdened by the warrantless inspections was both the *owner* and the *occupant* of the house under inspection. Under the Rental Inspection Ordinance, by contrast, the homeowner (landlord) and the occupant (tenant) of the inspected house are not the same person. Whether the Rental Inspection Ordinance as it existed on May 4, 2016, was unconstitutional depends in part on who, as between landlord and tenant, enjoys the protection of the Fourth Amendment and to what degree each of them enjoys it.

(1:16CV1076)

Again, all agree that inspections under the Rental Inspection Ordinance took place without any kind of administrative warrant procedure.  ECF No. 45 at PageID#: 397; *see* ECF No. 46 at PageID#: 490-91.  It is also undisputed that a property owner risked criminal penalty for failure to comply with the inspection requirement.  ECF No. 45 at PageID#: 397; ECF No. 46 at PageID#: 491.  According to Defendants, a property owner's "[f]ailure to apply for Certificate of Rental License, which triggers the inspection, would subject the owner to legal action or penalty as a violation of Bedford's Building Code."  ECF No. 46 at PageID#: 491 (emphasis omitted).

Defendants argue that rental inspections under the Ordinance were legitimate because they obtained the tenant's voluntary consent.  *Id.* at PageID#: 493.  That consent, they assert, was truly voluntary   tenants faced no threat of punishment for noncompliance.  *Id.* at PageID#: 491.  Rather, the potential for criminal punishment rested on the shoulders of the property owner.  *Id.*  According to Defendants, because tenants were not threatened into compliance, their consent to inspection was freely given, and that consent validated the subsequent inspections.  *Id.* at PageID#: 492.

As with the Point of Sale Inspection Ordinance, Plaintiffs ask the Court to rule that the Rental Inspection Ordinance was unconstitutional on its face.  ECF No. 45 at PageID#: 391.  That is, they ask the Court to find that the Rental Inspection Ordinance was unconstitutional in all its possible applications, not merely as applied to Plaintiffs.  *Ohio Citizen Action*, 671 F.3d at 570.  It is important to distinguish, then, between two factually distinct applications of the Rental Inspection Ordinance.  Rental inspections occurred in two circumstances: (1) whenever

(1:16CV1076)

there was a change in tenants, or (2) if there had been no change in tenants, then every two years.

ECF No. 21 at PageID#: 204.

### a. Cases in Which the Rental Unit Was Unoccupied

The City's policy under the Rental Inspection Ordinance insisted that the property owner "schedule an inspection prior to each new tenant. . . . This inspection should be done while the suite is still empty." *Id.*  Under these circumstances, there was no tenant occupying the premises   the only parties to the transaction were the property owner and the City.  Defendants' argument that their inspections were based on tenant consent, of course, has no application to inspections they performed while a given unit was unoccupied.

Anticipating this argument, Defendants contend that, even when there is no tenant occupying a unit, a landlord nevertheless has a diminished expectation of privacy in apartments that he holds out for rent.  ECF No. 46 at PageID#: 493-94.  To support that proposition, Defendants cite a case decided in 1980 by the New Jersey Supreme Court, *Dome Realty, Inc. v. City of Paterson*, 416 A.2d 334 (1980) ("Unlike the tenant in *Camara*, the landlord is not using the dwelling as his residence or place of business.  The landlord's expectation of privacy regarding one of his vacant properties would necessarily be attenuated.").

*Dome Realty*, however, conflicts with more persuasive authority, and in any event, it must be distinguished on its facts.  In *See v. City of Seattle*, the United States Supreme Court concluded, "administrative entry, without consent, upon the portions of commercial premises which are not open to the public may only be compelled through prosecution or physical force within the framework of a warrant procedure." 387 U.S. 541, 546 (1967).  In *Dearmore v. City of Garland*, a federal district court interpreted *See* to apply to vacant rental property because such

(1:16CV1076)

property is "commercial" it is "put in the stream of commerce for economic purposes." 400 F. Supp. 2d 894, 900 (N.D. Tex. 2005). Unoccupied rental units, therefore, were protected from warrantless searches by the Fourth Amendment. *Id.*; *see also Baker v. City of Portsmouth*, 2015 WL 5822659, at *5 (S.D. Ohio, Oct. 5, 2015) ("[T]he owners . . . of rental properties in Portsmouth are thus faced with the choice of consenting to the warrantless inspection or facing criminal charges, a result the Supreme Court has expressly disavowed under the Fourth Amendment.").

Finally, even if *Dome Realty* were authoritative, it is not aligned with the facts of this case. The New Jersey Supreme Court, in permitting warrantless inspections of rental property, expressly noted that, under the ordinance in question, the rental inspections "ha[d] no connection with a criminal investigation; the presence of violations, even the failure to request an inspection, ha[d] no punitive consequences for the landlord." 416 A.2d at 350. Such was not the case in Bedford. It is undisputed that, under Bedford's Rental Inspection Ordinance, a landlord's failure to comply with the inspection requirements was punishable by fines and imprisonment. ECF No. 45 at PageID#: 397; ECF No. 46 at PageID#: 491.

In cases in which a rental unit was unoccupied, Bedford was not constitutionally permitted to perform a warrantless inspection of that unit without the property owner's voluntary consent. As described above in the context of the Point of Sale Inspection Ordinance, the threat of criminal penalty made voluntary consent impossible as a matter of law.

### b. Cases in Which the Rental Unit Was Occupied

In cases in which the rental unit under inspection was occupied, however, the question remains: Did a tenant's voluntary consent validate the City's warrantless inspection of the rental

(1:16CV1076)

unit?  In *Camara*, the Supreme Court held that the "searches when authorized and conducted without a warrant procedure lack the traditional safeguards which the Fourth Amendment guarantees."  387 U.S. at 534.  In *Camara*, it was the *tenant* who refused inspection, and it was the *tenant* who was held criminally liable.  *Id.* at 526.  In this case, it was the *landlord* that faced criminal penalties for his failure to consent to a warrantless inspection.  ECF No. 46 at PageID#: 493.

It may be the case that, when a rental unit is occupied by a tenant, the landlord's privacy interest is subordinated to the tenant's.  To be sure, a tenant is ordinarily entitled to invite whomever she pleases to join her in her rental unit, including a City building inspector, with or without her landlord's approval.

The Rental Inspection Ordinance, however, gave no occasion for the City to interact with tenants at all.  The City's policy under the Ordinance, however, insisted that "you [the landlord] must make the necessary arrangements with the tenant to open their suite to the inspector . . . ."  ECF No. 21 at PageID#: 204.  It also insisted, "The code requires you, as the owner, to make the proper application each and every December for a new Certificate of Occupancy for each rental unit on a site."  *Id.*  Furthermore, in its response to interrogatories, the City indicated that no property owner, during the whole time the Rental Inspection Ordinance was implemented in Bedford, had failed to comply with the inspection requirement.  ECF No. 45-1 at PageID#: 421 (Interrogatory #8).  Given that it was the property owner's obligation to arrange an inspection and no property owner ever failed to comply, the Court perceives no grounds for a reasonable jury to find that the City ever interacted directly with a tenant to obtain her consent to inspection.

(1:16CV1076)

Instead, the Rental Inspection Ordinance placed the burden to consent to inspection squarely on the landlord. The tenant played no role in giving consent to inspection. As in cases in which the rental units were unoccupied, the only parties to the transaction were the property owner and the City. And as discussed in the context of the Point of Sale Inspection Ordinance, a property owner's "consent" to inspection of his property in the face of criminal penalty cannot be deemed voluntary. *See Camara*, 387 U.S. at 533; *Patel*, 135 S. Ct. at 2452.

Under the Ordinance, rental unit inspections were to be performed whether the units were occupied or not. *See* ECF No. 21 at PageID#: 204 ("[Y]ou [the property owner] are required to call for a rental inspection whenever there is a change in tenant, or a 2-year period, which ever is more frequent."). Whether or not a given rental unit was occupied, the City demanded the property owner "consent" to inspection at least once every two years. In either case, occupied or not, the property owner was forced to open the doors of his commercial property to City building inspectors under threat of criminal penalty. Under the Fourth Amendment, "business owners cannot reasonably be put to this kind of choice." *Patel*, 135 S. Ct. at 2452; *see See*, 387 U.S. at 546.

Because landlords, absent tenant intervention, have a constitutional right to privacy in both their occupied and unoccupied rental units, the Bedford landlords had a constitutional right to refuse inspection and demand a warrant. Faced with the threat of criminal penalty, property owners in Bedford had no opportunity to exercise that right. Bedford's Rental Inspection Ordinance, as it existed on May 4, 2016, was unconstitutional on its face and, consequently, also as applied to Plaintiffs because any consent given by a landlord could not have been voluntary.

### 3. Ordinances As They Exist Today

(1:16CV1076)

Both the Point of Sale Ordinance and Rental Inspection Ordinance have been amended to include an administrative warrant provision and to eliminate criminal penalties for failure to comply with inspection requirements. *See* ECF No. 17-1; ECF No. 31-1. None of Plaintiffs' factual allegations apply to the Ordinances as amended, and the Court draws no conclusions with respect to the Ordinances as amended.

### 4. Unjust Enrichment

In Prayer for Relief 4, Plaintiffs ask the Court to declare that the City of Bedford was unjustly enriched by implementing its unconstitutional Inspection Ordinances. ECF No. 45 at PageID#: 391. Plaintiffs intend to wield this declaration in search of monetary relief down the line, *see id.* (Prayers for Relief 9 and 13); *Berger*, 338 F.3d at 763-64 ("[A] declaratory judgment is normally a prelude to a request for other relief, whether injunctive or monetary . . . . No one wants an empty declaration.").

Federal courts are authorized to enter declaratory judgments and orders of restitution, as appropriate, as a direct remedy under Section 1983. *City of Monterey v. Del Monte Dunes at Monterey, Ltd.*, 526 U.S. 687, 751-52 (1999); *see also Samuel v. Univ. of Pittsburgh*, 538 F.2d 991, 994 95 (3d Cir. 1976). Section 1983 "provides a remedy, to be broadly construed, against all forms of official violation of federally protected rights." *Dennis v. Higgins*, 498 U.S. 439, 445 (1991) (quoting *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 700-01 (1978)).

More precisely, Plaintiffs ask the Court in Prayer 4 to declare that the City has been "unjustly enriched." ECF No. 45 at PageID#: 391. Unjust enrichment sounds in state law, and

(1:16CV1076)

courts usually conceive of it as an equitable doctrine.[4]  *See Mertens v. Hewitt Associates*, 508 U.S. 248, 255 (1993); *Baker*, 2015 WL 5822659, at *8.  More precisely, under Ohio law, "[a] suit that seeks the return of specific funds wrongfully collected or held by the state is brought in equity."  *Santos v. Ohio Bur. of Workers' Comp.*, 801 N.E.2d 441, 446 (Ohio 2004).

Sitting in equity, the Court assesses the merits of Plaintiffs' unjust-enrichment claim under Ohio state law.  If, by undisputed evidence, those elements are satisfied as a matter of law, then Plaintiffs are entitled to a declaration to that effect.  *See City of Monterey*, 526 U.S. at 751-52.

Under Ohio state law, a claim based on unjust enrichment has three elements: "(1) a benefit conferred by a plaintiff upon a defendant; (2) knowledge by the defendant of the benefit; and (3) retention of the benefit by the defendant under circumstances where it would be unjust to do so without payment . . . ."  *Johnson v. Microsoft Corp.*, 834 N.E.2d 791, 799 (Ohio 2005).  In this case, if the first factor is assumed (property owners paid inspection fees under both ordinances), then the second is obvious   the City was aware they had received payments on those fees.  But the City contends that neither the first nor the third factors of the unjust-enrichment test are met.

Regarding the first factor, the City contends that Plaintiffs did not confer a benefit on the City by paying inspection fees   or, at least, that there remains a genuine dispute of material fact

---

[4] To be clear, a federal district court need not resort to state law to conclude that aggrieved parties are entitled to compensation for a violation of 42 U.S.C. § 1983.  The Court only engages with Ohio state law in this instance because Plaintiffs ask the Court for a declaration that the City has been "unjustly enriched," ECF No. 45 at PageID#: 391, which sounds in state law.  To the extent the question does not "arise under" federal law, 28 U.S.C. § 1331, the Court nevertheless takes subject-matter jurisdiction under 28 U.S.C. § 1367.

(1:16CV1076)

in that respect.  ECF No. 46 at PageID#: 496.  The City argues that, because it spent more than

the amount of the fees in conducting the inspections, Plaintiff class members did not confer any

benefit on it.  *Id.*  This argument misses the mark.  It is not relevant how the City chose to spend

its ill-gotten gains once it received them.  Whether the City spent the fee amount or not, and

regardless of the costs the City incurred, homeowners enriched the City, $50 to $200 per Point of

Sale inspection and $20 to $100 per Rental inspection at a time.  ECF No. 1-2 at PageID#: 22;

ECF No. 21 at PageID#: 204.  To rule otherwise would be to insist that Plaintiffs pay to have

their constitutional rights violated.

      The third factor asks whether it would be unjust for the City to retain the fees it

unlawfully obtained.  *Johnson*, 834 N.E.2d at 799.  Courts, including this one, have made

precisely that finding when government entities have extracted funds from citizens under color of

law.  In *Jordan v. City of Bucyrus*, the Court awarded a refund to city employees when the city

unconstitutionally withheld $11.00 per month from their paychecks in order to pay the

firefighters' union.  739 F. Supp. 1124 (N.D. Ohio 1990).  In *Samuel*, the Third Circuit found

that the University of Pittsburgh was unjustly enriched when it charged higher tuition fees to

some students based on unconstitutionally discriminatory residency requirements.  538 F.2d at

995.  In neither of those cases, however, did the government defendant obtain its ill-gotten gains

by threatening noncompliant plaintiffs with criminal prosecution, as Bedford did with its

Inspection Ordinances.  *See* ECF No. 45 at PageID#: 394-95, 397; ECF No. 46 at PageID#: 485,

491.  For Bedford to retain the funds it received would be even more unjust than in either *Jordan*

or *Samuel*.

(1:16CV1076)

The Court finds, and hereby declares, that Bedford has been and continues to be unjustly enriched by the fees it charged for implementing the Point of Sale Inspection Ordinance between September 10, 2014, and January 30, 2017, and the Rental Inspection Ordinance between September 10, 2014, and February 14, 2017.

### 5. Conclusions

In Prayer for Relief 1, Plaintiffs ask the Court to declare that the Point of Sale Inspection Ordinance and the Rental Inspection Ordinance, as they existed on May 4, 2016, were unconstitutional both facially and as applied to Plaintiffs. Because there is no genuine dispute of material fact and Plaintiffs are entitled to judgment as a matter of law, summary judgment is granted as to Prayer 1.

Prayer for Relief 2 is unclear. To the extent Prayer for Relief 2 asks the Court to rule on the constitutionality of Bedford's "current Rental Inspection Requirements," ECF No. 45 at PageID#: 391, summary judgment is denied because the Rental Inspection Ordinance has been amended to remove offensive provisions. To the extent Prayer for Relief 2 is redundant with Prayer 1, summary judgment is granted.

In Prayer for Relief 4, Plaintiffs request a declaration that the City of Bedford was unjustly enriched by carrying out its inspection scheme under the Ordinances. ECF No. 45 at PageID#: 391. Because there is no genuine dispute of material fact and Plaintiffs are entitled to judgment as a matter of law, summary judgment is granted as to Prayer 4. In granting summary judgment on Prayer 4, however, the Court does not express an opinion about the amount due to each class member. That subject is discussed below.

### C. Monetary Relief (Prayers Nine and Thirteen)

(1:16CV1076)

In Prayers 9 and 13, Plaintiffs demand monetary (as opposed to declaratory) relief. The Prayers are distinct from one another in that Prayer 9 demands relief as against the City, and Prayer 13 appears to demand relief as against all Defendants, including building inspectors Rob Brown and Richard Hickman. Whereas Prayer 9 can be characterized as equitable restitution (because it seeks a refund directly from the City), Prayer 13 can only be described as a claim for legal damages, at least insofar as it seeks relief from Defendants Brown and Hickman.

### 1. Monetary Relief Under Rule 23(b)(2) Class Certification

The Supreme Court in *Wal-Mart Stores, Inc. v. Dukes* "expressed serious doubt about whether claims for monetary relief" can ever be granted to a class certified under Rule 23(b)(2). 564 U.S. 338, 360 (2011) (citing *Ticor Title Ins. Co. v. Brown*, 511 U.S. 117, 121 (1994)). Rather, "individualized monetary claims belong in Rule 23(b)(3)." *Dukes*, 564 U.S. at 362.

A (b)(2) class certification results in injunctive or declaratory relief equally applicable to all class members. All class members, whether present or absent from the litigation, are affected by the outcome in precisely the same way. For that reason, a (b)(2) class is considered "mandatory"    class members cannot opt out of the litigation. Rule 23(b)(3), by contrast, is an "adventuresome innovation" of the Federal Rules of Civil Procedure, to be used in cases where "class-action treatment is not as clearly called for . . . [but] may nevertheless be convenient and desirable." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 615 (1997) (citations omitted).

Class-wide litigation for monetary relief poses risks to absent class members because each class member might have a different amount at stake. When individualized monetary relief is at stake (as opposed to indivisible injunctive relief), a putative class member may wish to opt out of class representation and pursue her case alone. *See* Fed. R. Civ. Pro. 23(c)(2)(B)(v). And

(1:16CV1076)

she is constitutionally entitled to do so.  *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807 (1985) ("[A] chose in action is a constitutionally recognized property interest possessed by each of the plaintiffs.").  The "procedural protections" that accompany Rule 23(b)(3) are critical when class-action plaintiffs demand individualized monetary relief.  *See Dukes*, 564 U.S. at 362.

In this litigation, so far, the Court has certified Plaintiffs' proposed class under Rule 23(b)(1)(A) and (b)(2), but not (b)(3).  In Prayers 9 and 13, Plaintiffs ask the Court to order "restitution" and "reimbursement," respectively, for the unlawfully-obtained inspection fees.  Because those Prayers demand monetary relief without the procedural protections attending a (b)(3) certification, they are suspect.[5]

The Supreme Court in *Dukes*, however, left open a possible avenue for monetary relief under (b)(2) if the money award is "incidental to the injunctive or declaratory relief." *Id.* at 360.  Lower courts have sharpened the point:

> Should it appear that the calculation of monetary relief will be mechanical, formulaic, a task not for a trier of fact but for a computer program, so that there is no need for notice and the concerns expressed in the *Wal-Mart* [*v. Dukes*] opinion are thus not engaged, the district court can award that relief without terminating the class action and leaving the class members to their own devices and also without converting this (b)(2) class action to a (b)(3) class action.

*Johnson v. Meriter Health Servs. Employee Retirement Program*, 702 F.3d 364, 372 (7th Cir. 2012).

---

[5] Although the Supreme Court in *Dukes* considered the appropriateness of monetary relief only under (b)(2), the Sixth Circuit has interpreted the Supreme Court's (b)(2) analysis in Dukes to apply equally to classes certified under (b)(1)(A).  *Clemons v. Norton Healthcare Inc. Retirement Plan*, 890 F.3d 254, 281 (6th Cir. 2018) ("[T]he due process concerns that led the Court to conclude that 'individualized monetary claims belong in Rule 23(b)(3)' are similar for (b)(1) classes.").  Plaintiffs, therefore, cannot distinguish *Dukes* and demand a money award simply by noting that their class is certified under (b)(1)(A) as well as (b)(2).

(1:16CV1076)

In this case, it is plausible that Prayer 9 is "incidental" to the declaratory relief requested in Prayers 1, 2, and 4, and therefore appropriately awarded even without a (b)(3) class certification.[6] In Prayer 9, Plaintiffs ask the Court to order the City to return the fees it collected. ECF No. 45. The amount of the fees was assessed on a fee schedule. For Point of Sale inspections, the City charged "$50 for single-family dwelling plus $25 for each additional rental unit; commercial buildings are a minimum fee $75 and maximum fee $200." ECF No. 1-2 at PageID#: 22. For rental inspections, the City charged "a yearly fee of $50 per SINGLE-family, $75 for TWO-family, $100 for THREE-family dwelling unit . . . or the amount of $20 per suite in a structure with FOUR or more apartments. . . ." ECF No. 21 at PageID#: 204. Given that Plaintiffs have submitted a detailed spreadsheet (almost entirely undisputed)[7] listing precisely what amount each class member is due, the calculation of their entitlement to monetary relief begins to appear "mechanical, formulaic, a task not for a trier of fact but for a computer program . . . ." See Johnson, 702 F.3d at 372.

The class members' entitlement to restitution, however, is more complicated than a wholesale return of fees according to the fee schedule. In their opposition brief, Defendants point out that a portion of each home inspection was dedicated to "naked-eye observations of the

---

[6] Prayer 13 cannot plausibly be considered "incidental" to the declaratory relief granted in response to Prayer 4. In Prayer 4, Plaintiffs request (and the Court grants) a declaration that "Defendant City of Bedford" was unjustly enriched. ECF No. 45 at PageID#: 391. Because Prayer 13 asks the Court to enter a money judgment against Defendant building inspectors Rob Brown and Richard Hickman, it is not "incidental" to the declaratory relief granted under Prayer 4, which only applies against the City.

[7] In Defendants' opposition brief, they asserted that the City's Building Department Clerk compared Plaintiffs' records with the City's records and "found 12 instances where Bedford did not collect a fee, or there was a duplication of inspections or fees noted by the Plaintiffs." ECF No. 46 at PageID#: 498.

(1:16CV1076)

structure's exterior." ECF No. 46 at PageID#: 497. Such naked-eye observations, they argue, do not add up to a Fourth-Amendment search, and therefore, the inspection fees were not wholly dedicated to funding an unconstitutional enterprise. See id. at PageID#: 497-98. Defendants suggest that, because inspectors spent roughly one-third of each inspection performing naked-eye observations of the exterior, the class members are not entitled to restitution on the whole amount of the fees they paid to the City.[8]

In their reply brief, Plaintiffs concede that "all exterior portions of rental and point of sale inspections" were "constitutionally permissible." ECF No. 47 at PageID#: 541 (emphasis omitted). They also acknowledge that identifying the portions of a given home that are constitutionally protected is a "fact-intensive inquiry." Id. Accordingly, they stipulate to a *pro rata* reduction by one-third of all inspection fees as to each subclass.[9] Id.

In conceding such a reduction, Plaintiffs resolve the apparent dispute of material fact, but they unsheathe a different problem. By Plaintiffs' own admission, calculating the monetary relief for each class member depends on what portion of each inspection was a Fourth-Amendment search. Such a determination requires a "fact-intensive inquiry," ECF No. 47 at PageID#: 541, dependent on the particulars of each inspection and the physical contours of each home. That kind of calculation is neither "mechanical" nor "formulaic," and it suggests Plaintiffs cannot recover a class-wide money award under a (b)(2) certification. See Johnson, 702 F.3d at 372.

---

[8] Defendants deny liability altogether. The argument described here is an argument in the alternative.

[9] "The amount of restitution owed to the members of Subclass A [Point of Sale Inspection class] is reduced from $23,575 to $15,717 . . . [and] the amount of restitution owed to the members of Subclass B [Rental Inspection class] is reduced from $38,125 to $25,417. . . ." ECF No. 47 at PageID#: 541.

(1:16CV1076)

When class members' entitlement to monetary recovery depends on a factual inquiry, the procedural protections described in the *Dukes* opinion — "predominance, superiority, mandatory notice, and the opportunity to opt out" — are especially relevant. *See* 564 U.S. at 362. In this case, the class representatives are willing to trade away one-third of the class's potential recovery in order to expedite the resolution of the case. ECF No. 47 at PageID#: 541. Such a trade would bind, and preclude from future litigation, absent class members who not only have not consented to representation by the class representatives but may not even be aware that litigation is pending. The Court in *Dukes* was primarily concerned that "individual class members' compensatory-damages claims would be precluded by litigation they had no power to hold themselves apart from." 564 U.S. at 364.

Plaintiffs' request for monetary recovery under a (b)(2) certification is not salvaged merely by labeling their request as "equitable." ECF No. 33 at PageID#: 323-24; *see* ECF No. 45 at PageID#: 411. The practical distinction between *damages* and *equitable restitution*, is not relevant to the present discussion. The class representatives in *Dukes* labeled their backpay claims as "equitable," and they were rejected. 546 U.S. at 365. Rule 23(b)(2) embraces injunctive and declaratory relief, not all relief that can plausibly be described as "equitable." *Id.* ("The Rule does not speak of 'equitable' remedies generally but of injunctions and declaratory judgments. . . . [B]ackpay is neither."). Plaintiffs' demand for class-wide monetary relief is neither injunctive nor declaratory in nature. It requires class certification under (b)(3) to move forward.

(1:16CV1076)

Because this litigation stands in the same posture as *Dukes*, that is the Court has not yet

certified a class under Rule 23(b)(3), individualized monetary relief sought in Prayers 9 and 13 is

inappropriate at this time.

### 2. Bifurcated Certification

In class action proceedings, it is sometimes appropriate for a court to address class

certification in stages, particularly "when the declaratory relief serves as a predicate for later

monetary relief . . . ." *Gooch*, 672 F.3d at 429.  Additionally, Rule 23(c) provides, "An order that

grants or denies class certification may be altered or amended before final judgment." Fed. R.

Civ. Pro. 23(c)(1)(C).

In *Gooch*, the putative class representatives asked the district court to "certify a

Declaratory Relief Class pursuant to Rule 23(b)(2) and, at such time as the Court deems proper,

then certify the Restitution/Monetary Relief Sub  Class as a class action pursuant to Rule

23(b)(3)." 672 F.3d at 427 (internal quotation marks and ellipses omitted).  The money award

for each class member was "predicate[d]" on declaratory relief, *id.* at 429, but it was not

"incidental" to declaratory relief, *Dukes*, 564 U.S. at 360.  Because the class representatives in

*Gooch* asked for both declaratory relief and subsequent individualized monetary relief, the

district court certified the class and ruled on relief in stages. 672 F.3d at 428.  It certified a class

under (b)(2) for declaratory relief first, and it reserved certification under (b)(3) while

declaratory-relief proceedings were underway. 672 F.3d at 428.  The Sixth Circuit approved the

district court's approach, *id.*, and it has since labeled the practice "bifurcated certification."

*Clemons v. Norton Healthcare Inc. Retirement Plan*, 890 F.3d 254, 279 (6th Cir. 2018).

(1:16CV1076)

In this case, fortunately, both parties have already briefed the Court concerning a (b)(3) class certification, *see* ECF Nos. 27, 28, 33, and the issue is ripe for the Court's attention.

### 3.  Class Certification Under Rule 23(b)(3)

For the reasons described below, the Court certifies Subclasses A and B (as already defined) under Fed. R. Civ. Pro. 23(b)(3).

### a.  Rule 23(a) Requirements and Subclass Definitions

To maintain a class action lawsuit under Rule 23(b)(3), the proposed class (and subclasses) must satisfy the requirements of Rule 23(a) as well as those of (b)(3).  Fed. R. Civ. Pro. 23(b).  In certifying the initial (b)(2) class, the Court already addressed the Subrule (a) requirements    numerosity, commonality, typicality, and adequacy of representation    and found them satisfied.  ECF No. 35 at PageID#: 359-64.  The same analysis applies to the (b)(3) analysis, and the Court incorporates it here by reference.

Nevertheless, it is necessary to reassess the subclass definitions to ensure they comply with Rule 23's implied ascertainability requirement. *See Cole v. City of Memphis*, 839 F.3d 530, 541-42 (6th Cir. 2016) (ascertainability is a required component of class certification under Rule 23(b)(3) but not (b)(2)).  Ascertainability is not an express requirement of Rule 23, but it reflects the practical need for "a class description [that is] sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member." *Id.* at 541 (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 538 (6th Cir. 2012)).

In this case, Plaintiffs have submitted two alphabetically organized spreadsheets, one for each subclass, listing the name and address of every putative class member, the date of inspection of that putative class member's home, and the fee that class member paid.  ECF No. 45-2.

(1:16CV1076)

Subclasses A and B are thus ascertainable as already defined.  Subclasses A and B shall retain the

same class definitions for the purposes of (b)(3) certification as they did for (b)(2) certification,

namely:

> **Subclass A:** All individuals and businesses that have (1) been subjected to Point
> of Sale Inspections between September 10, 2014 and January 30, 2017; and (2)
> paid Points of Sale Inspection fees to the City of Bedford in conjunction with the
> aforesaid inspection(s).

> **Subclass B:** All individuals and businesses that have (1) been subjected to rental
> inspections between September 10, 2014 and February 14, 2017; and (2) paid
> Rental Inspection fees to the City of Bedford in conjunction with the aforesaid
> inspection(s).

### b.  Rule 23(b)(3) Requirements: Predominance and Superiority

Class certification under Rule 23(b)(3) is appropriate when "questions of law or fact

common to class members predominate over any questions affecting only individual members"

and "a class action is superior to other available methods for fairly and efficiently adjudicating

the controversy."  Fed. R. Civ. P. 23(b)(3).  The predominance and superiority requirements of

(b)(3) are safeguards for absent class members.  *See Dukes*, 564 U.S. at 362.  The twin mandates

ensure that absent class members are not unwittingly or illogically roped into representative

litigation that they might have been better off pursuing on their own.

"To meet the predominance requirement, a plaintiff must establish that issues subject to

generalized proof and applicable to the class as a whole predominate over those issues that are

subject to only individualized proof."  *Young*, 693 F.3d at 544.  "When one or more of the central

issues in the action are common to the class and can be said to predominate, the action may be

considered proper under Rule 23(b)(3) even though other important matters will have to be tried

(1:16CV1076)

separately, such as damages or some affirmative defenses peculiar to some individual class members." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016).

In this case, all putative members of Subclass A were subject to a common Point of Sale Inspection Ordinance, and all putative members of Subclass B were subject to a common Rental Inspection Ordinance.  All putative class members had their property inspected by a common crew of City employee inspectors, including Rob Brown and Richard Hickman.  ECF No. 21 at PageID#: 177-78.  Those inspectors abided by a common set of policies and practices.  *Id.* at PageID#: 178, ¶ 29.  There may be, as described above, significant factual differences in each class member's case.  Defendants might present an affirmative defense that applies more strongly as to one class member than another.  But given the solid core of questions common to all class members, the Court is satisfied that the proposed (b)(3) subclasses "are sufficiently cohesive to warrant adjudication by representation." *Tyson Foods, Inc.*, 136 S. Ct. at 1045.

The Court is also satisfied that class-wide litigation "is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. Pro. 23(b)(3). Class litigation presents the prospect for joint settlement or stipulation, or if the case reaches a jury, a total figure amenable to fair disbursal by the Court.  *See Tyson Foods*, 136 S. Ct. At 1050.[10]  Plaintiffs and Defendants have already come within arm's reach of a stipulated damages figure.  *See* ECF No. 46 at PageID#: 497-98; ECF No. 47 at PageID#: 541-42.  Had the class been properly certified under Rule 23(b)(3), that near-stipulation might have resolved the matter altogether, for all class members at once.

---

[10] On remand, the District Court issued an order explaining its method for disbursing the total jury award.  *Bouaphakeo v. Tyson Foods, Inc.*, 214 F. Supp. 3d 748 (N.D. Iowa 2016).

(1:16CV1076)

Finally, (b)(3) class treatment is the only realistic way for class members to vindicate their claims.  "The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights."  *Amchem*, 521 U.S. at 617 (quoting *Mace v. Van Ru Credit Corp.*, 109 F.3d 338, 344 (1997)).

Because all parts of Rule 23(a) are satisfied, the subclass definitions make class members ascertainable, common questions predominate, and class-wide litigation is the fairest, most efficient way of adjudicating the controversy, the Court hereby certifies Subclasses A and B for their monetary claims under Rule 23(b)(3).

### c. Class Counsel for the (b)(3) Subclasses

Because the Court has already determined that the 1851 Center for Constitutional Law is competent to represent the class in this litigation, ECF No. 35 at PageID#: 363-64, and because the Court perceives no intra-class conflicts, *id.*, the 1851 Center shall continue to represent Subclasses A and B for the (b)(3) portion of this litigation.

### IV. Conclusion

In accordance with Rule 23(c)(2)(B), Class Counsel is hereby ordered to submit to the Court for approval a Notice of Pendency of a Class Action under Rule 23(b)(3) no later than September 21, 2018.  The Notice must clearly and concisely state in plain, easily understood language:

(i) the nature of the action;

(ii) the definition of the class certified;

(iii) the class claims, issues, or defenses;

(1:16CV1076)

(iv) that a class member may enter an appearance through an attorney if the member so desires;

(v) that the court will exclude from the class any member who requests exclusion;

(vi) the time and manner for requesting exclusion; and

(vii) the binding effect of a class judgment on members under Rule 23(c)(3).

The proposed Notice shall also describe Class Counsel's proposed cutoff date for class members to opt out.

Any objections to the proposed Notice should be made in redline format within three days of Class Counsel's submission of the proposed Notice. If the Court approves Class Counsel's proposed Notice, the class representatives are responsible for disseminating that Notice individually to all class members who can be identified with reasonable effort at the class representatives' own expense. *Eisen v. Carlisle and Jacquelin*, 417 U.S. 156, 177 (1974); Fed. R. Civ. Pro. 23(c)(2)(b).

For the foregoing reasons, the Court grants summary judgment on Prayers for Relief 1, 2, and 4, except to the extent Prayer 2 asks for a judgment on the Rental Inspection Ordinance as amended. It declares that the City's Point of Sale Inspection Ordinance and Rental Inspection Ordinance, as they existed on May 4, 2016, are unconstitutional both facially and as applied to Plaintiffs because they violate the Fourth Amendment to the U.S. Constitution. It further declares that fees resulting from searches under those Ordinances resulted in unjust enrichment and that Plaintiffs are entitled to compensation.

(1:16CV1076)

Under the circumstances, however, the amount of compensation to which Plaintiffs are

entitled can only be resolved on a class-wide basis if Plaintiffs' class is certified under Rule

23(b)(3).  The Court therefore denies Prayers 9 and 13 without prejudice to a later filing after

absent members of the (b)(3) class have received notice of the litigation and have been afforded

the opportunity to opt out.


IT IS SO ORDERED.


    September 10, 2018                               */s/ Benita Y. Pearson*

Date                                              Benita Y. Pearson

                                              United States District Judge